Mark S. Cheffo (*pro hac vice* forthcoming)
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Email:  mark.cheffo@dechert.com

Will W. Sachse (*pro hac vice* forthcoming)
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
Email: will.sachse@dechert.com

Jonathan Tam (SBN 304143)
DECHERT LLP
One Bush Street, Suite 1600
San Francisco, CA  94104-4446
Telephone: (415) 262-4500
Facsimile: (415) 262-4555
Email: jonathan.tam@dechert.com

*Attorneys for Defendant GlaxoSmithKline LLC*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD BONVINO; RAYMOND JACK; ROSA MATTHEWS; ALAM ALI;  PLAINTIFIF MICHELE GIL, ON BEHALF OF JOSE GIL, JR., DECEDENT;  PLAINTIFF BRANDI SMITH ON BEHALF OF TAMARA REYNOLDS, DECEDENT; PLAINTIFF HAROLD BAKER ON BEHALF OF SHARON BAKER, DECEDENT; GEORGE KELLY; JACK DUDUM; ANTHONY SCARSCIOTTI; SENTELLE EUBANKS; ROBERT HASSON; RAYMOND ACOSTA; BARRY WEINER; KURT CARR; JUNE YU; KIRK WILLIAMS; ERIC JOHNSON; LEWIS WOODS; STEVEN NEWKIRK; DALE BREMENOUR; DANIEL MATHENY; LORETHA BARTHEL; RICHARD PELOQUIN; LINDA GOOLSBY; WALTER CARDINAL; MARYBELLE CALHOUN; ROY TADA; DONALD QUICK; ANTHONY NICHOGI; TOMMY DAVIS; PLAINTIFF LINDA KELLY ON BEHALF OF DAVID KELLY, DECEDENT; GUY HARRIS; MICHAEL JOHNSON; STANLEY KELLY; LINDA STIERS; GLORIA TRILLO-ROBINSON; BRIAN LEE; RAYMOND HARTLEY; | Case No. <br><br> **NOTICE OF REMOVAL OF ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

CHRISTINA DIAZ; MICHELLE SANDOWSKY;
LAURIE WOODS; WILLIAM FAST; JUDITH
MOTYKA; KAREN FLEEMAN; CHRISTOPHER
VILLA; GERALD MARINER; CLARENCE
DYKES; PLAINTIFF ROCKY JENSEN ON
BEHALF OF JULIA JENSEN, DECEDENT;
SAMUEL PEWETT; JULIETA MARX; PETER
LOONEY; PLAINTIFF FAITH PERUE ON
BEHALF OF WILLIAM PERUE, DECEDENT;
DENNIS KARST; and DENNY ELLINGSEN,

                        Plaintiffs,

        v.

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC., INCORRECTLY
DESIGNATED AS DOE 1; BOEHRINGER
INGELHEIM USA CORPORATION,
INCORRECTLY DESIGNATED AS DOE 2;
GLAXOSMITHKLINE LLC, INCORRECTLY
DESIGNATED  AS DOE 3; PFIZER INC.,
INCORRECTLY DESIGNATED AS DOE 4;
SANOFI US SERVICES INC., INCORRECTLY
DESIGNATED AS DOE 5; SANOFI-AVENTIS
U.S. LLC, INCORRECTLY DESIGNATED AS
DOE 6; SAFEWAY, INC.; SAFEWAY HEALTH,
INC.; THE VONS COMPANIES, INC; GROCERY
OUTLET; KAISER PERMANENTE
INTERNATIONAL; AND DOES 7 THROUGH 100
INCLUSIVE,

                        Defendants.

**DEFENDANTS BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.,
BOEHRINGER INGELHEIM USA CORPORATION, GLAXOSMITHKLINE LLC,
PFIZER INC., SANOFI US SERVICES INC., AND SANOFI-AVENTIS U.S. LLC'S
NOTICE OF REMOVAL**

        Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants Boehringer Ingelheim

Pharmaceuticals, Inc., Boehringer Ingelheim USA Corporation, GlaxoSmithKline LLC, Pfizer Inc.,

Sanofi US Services Inc., and Sanofi-Aventis U.S. LLC (collectively, the "Removing

Defendants")—all of which were improperly and incorrectly named as Doe Defendants—hereby

give notice of removal of this action, *Bonvino, et al. v. Safeway, Inc., et al.*, Case No. RG20073321,

from the Superior Court of the State of California in and for Alameda County to the United States

District Court for the Northern District of California.[1]  Defendants Safeway Inc. (incorrectly named as "Safeway, Inc. and Safeway Health, Inc."), The Vons Companies, Inc., Grocery Outlet, Inc. (incorrectly named as "Grocery Outlet"), and Kaiser Permanente International (collectively, the "Retailer Defendants") consent to the removal.

## INTRODUCTION

1.      In this mass tort action claiming that the antacid medication Zantac (ranitidine) causes various cancers, Plaintiffs' counsel has deployed a veritable "bag of tricks" to try to defeat Removing Defendants' right to a federal forum.  *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005) ("The removal process was created by Congress to protect defendants. Congress did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it.'" (citation omitted)).  These same Plaintiffs' counsel previously filed 42 substantively identical cases in California, which were removed to federal court and stayed pending transfer to the Zantac MDL in the Southern District of Florida.  While the substantive allegations in this Complaint are essentially the same as those in the first round of cases, Plaintiffs' counsel has re-engineered this Complaint (and a raft of similar Complaints) in a transparent attempt to make it "removal-proof." (A copy of the Complaint is attached as **Exhibit A**.).  As further explained below, none of these machinations can thwart the diversity jurisdiction that exists between the proper defendants and numerous Plaintiffs.

2.      **First**, even though the allegations are plainly directed at the Removing Defendants who were named in the first round of cases, Plaintiffs' counsel intentionally omits those Defendants from the caption of the pleading and instead mis-identifies them as "DOES 1 through 100."  But the Removing Defendants are proper defendants to the case who can exercise removal rights despite Plaintiffs' purposely misnaming them as Doe Defendants.  Plaintiffs repeatedly and specifically identify the Removing Defendants **by name** in the body of the Complaint as the parties that developed or held regulatory license for Zantac and, in some instances, as supposedly knowing about the presence of NDMA in the product.  And the Complaint repeatedly describes the Doe Defendants to include the "manufacturers" of Zantac who they allege failed to label the product

---

[1] By removing this action, Removing Defendants do not waive, and expressly preserve, any objections to personal jurisdiction.

appropriately.  Of course, Plaintiffs' counsel knows full well who the companies responsible for manufacturing and labeling Zantac are because counsel sued them in the "first round" of Zantac cases filed in California state court.  The Removing Defendants are therefore proper parties to this removal petition and their citizenship must be considered for diversity purposes.  *See Neng Por Yang v. Nutter*, 2011 WL 2746191, at *1, *4-5 (D. Minn. July 14, 2011) (granting John Doe defendants' motion to dismiss after they removed); *Avon Grp. LLC v. Mosdos Chofetz Chaim Inc.*, 2012 WL 2886697, at *2 n.1 (S.D.N.Y. July 13, 2012) (*Neng Por* "implicitly allowed" "John Doe Defendants [to] remove a case from state court"); *Sandoval v. Republic Servs., Inc.*, 2018 WL 1989528, at *3 (C.D. Cal. Apr. 24, 2018) ("'[W]hen a plaintiff's allegations give a definite clue about the identity of a fictitious defendant . . . the court *should* consider the citizenship of the fictitious defendant.'" (emphasis in original; citation omitted)).

3.    ***Second***, unlike the first tranche of cases, Plaintiffs intentionally fail to identify the residency of Plaintiffs to obscure whether diversity exists as to those Plaintiffs.  The Court should not allow Plaintiffs' counsel's intentional omission of any allegations regarding Plaintiffs' citizenships in the Complaint to stand as a jurisdictional obstacle.  Removing Defendants' good faith investigation reveals that no fewer than 21 of 55 Plaintiffs are of diverse citizenship to the Removing Defendants.[2]  As to the remaining Plaintiffs, the Court should order limited jurisdictional discovery.  *See, e.g.*, *Berkeley Research Grp., LLC v. United Potato Growers of Am., Inc.*, 2017 WL 952680, at *2 (N.D. Cal. Mar. 13, 2017) ("'Discovery may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008)); *id.* (ordering jurisdictional discovery as to plaintiff's citizenship in light of plaintiff's "unnecessarily cryptic declarations"); *Murchison Capital Partners, L.P. v. Nuance Commc'ns, Inc.*, 2013 WL 3328694, at *1, *4 (N.D. Tex. July 2, 2013) (ordering same "[b]ecause the court [could not] determine whether complete diversity exists between the parties" after plaintiffs "refused to . . . provide information in its possession and its control").

---

[2] Plaintiffs Roy Tada and Raymond Hartley were listed twice in Plaintiffs' original case caption, but only counted once for purposes of tabulating the total number of Plaintiffs in this lawsuit.

4.    Then, the claims of any Plaintiffs who are determined to be non-diverse from the Removing Defendants after discovery should be severed and dismissed to preserve diversity jurisdiction over the remaining Plaintiffs. *See, e.g.*, *In re Propecia (Finasteride) Prod. Liab. Litig.*, 2013 WL 3729570, at *14-15 (E.D.N.Y. May 17, 2013) (severing and remanding "only those plaintiffs whose presence destroys diversity" because "plaintiffs' attempt to deny the defendants their right to removal [by filing a multi-plaintiff complaint] undermines both the purposes of permissive joinder and the benefits of consolidation in multi-district litigation"); *infra* at 11-12 (collecting similar cases).

5.    ***Finally***, just as in the last set of cases, Plaintiffs continue to fraudulently join local California retailers against whom no viable claims exist. But it remains clear that the citizenship of the Retailer Defendants must be disregarded because they are fraudulently joined. Plaintiffs cannot state any viable strict products liability claim against the Retailer Defendants because those claims are preempted by federal law. The Retailer Defendants lack the legal authority under U.S. Food and Drug Administration ("FDA") regulations to unilaterally alter Zantac's government-approved labeling or to manufacture the product differently. *See, e.g.*, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) ("If the Manufacturers had independently changed their labels to satisfy their state-law duty [to attach a safer label], they would have violated federal law."); *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 2012 WL 181411, at *3 (D.N.J. Jan. 17, 2012) ("As a distributor of Fosamax, Watson has no power to change Fosamax labeling. That power lies with the applicant who filed the New Drug Application . . . seeking approval to market Fosamax.").

6.    Nor do Plaintiffs state a viable negligence claim against the Retailer Defendants. The basis for Plaintiffs' claim is that the Retailer Defendants allegedly failed to ascertain that the products at issue can degrade under certain conditions to form a compound called N-nitrosodiethylamine ("NDMA"), and failed to properly store Zantac to avoid such degradation. Compl. ¶¶ 267-70. It is black-letter law that retailers do not have a duty to inspect or test products in common use for defects unknown to them. *See Sears, Roebuck & Co. v. Marhenke*, 121 F.2d 598, 600 (9th Cir. 1941) (applying California law) (a retailer "who purchases and sells an article in common and general use, in the usual course of trade, without knowledge of its dangerous qualities

is not under duty to exercise ordinary care to discover whether it is dangerous or not"); *Valentine v. Baxter Healthcare Corp.*, 68 Cal. App. 4th 1467, 1485–86 (1999) ("[I]mposition of liability for breach of an independent duty to conduct long-term testing, where the causal link to the known harm to plaintiff is the *unknown outcome of testing that was not done*, would be beyond the pale of any California tort doctrine we can identify.") (emphasis in original).  Otherwise, every retailer in California would have the responsibility to conduct a battery of scientific testing on all pharmaceuticals stocked on its shelves, despite their FDA approval, in order to independently ascertain their safety.  That is not the law.

## JURISDICTION

7.    The Removing Defendants remove this action on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

8.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because: (1) there is complete diversity between numerous Plaintiffs and the proper defendants, and the citizenship of the Retailer Defendants and any non-diverse Plaintiffs may be disregarded pursuant to Federal Rule of Civil Procedure 21 and the doctrines of fraudulent joinder and/or fraudulent misjoinder; (2) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (3) all other requirements for removal have been satisfied.

## BASIS FOR REMOVAL

**I.    The Court Has Diversity Jurisdiction Over This Action.**

    **A.    The Removing Defendants Are The Proper Defendants.**

9.    The Removing Defendants—the companies which manufactured, labeled, and/or designed Zantac—are the proper defendants in this case despite Plaintiffs' attempt to defeat removal by naming them only as "Doe Defendants."

10.    That the Removing Defendants are named in the Complaint under the guise of Doe Defendants is obvious on the face of Plaintiffs' pleadings.  The gravamen of the Complaint is that the defendants manufactured Zantac defectively, leading to contamination with NDMA, and failed to warn about the presence of that chemical.  The Complaint thus repeatedly identifies the Removing

Defendants *by name* as the companies responsible for developing, labeling, and manufacturing Zantac. By way of example, the Complaint alleges (emphases added):

- "Zantac (ranitidine) was originally discovered and developed by scientist John Bradshaw on behalf of *GlaxoSmithKline* ("*GSK*") in 1976." Compl. ¶ 97 (footnote omitted).

- "Zantac was approved by the FDA . . . and, quickly, became one of *GSK's* most successful products." *Id.* ¶ 100.

- "In October 2000, *Pfizer* obtained full rights to OTC Zantac in the United States and Canada from GSK pursuant to a divestiture and transfer agreement." *Id.* ¶ 104.

- "In 2006, *Pfizer* . . . transferred all assets pertaining to its Zantac OTC line of products . . . to *Boehringer Ingelheim Pharmaceuticals, Inc.* As part of this deal, Boehringer obtained control and responsibility over all of the Zantac OTC NDAs." *Id.* ¶ 106.

- "In 2016, Boehringer sold the rights of OTC Zantac to *Sanofi US Services, Inc*. As part of this deal, Sanofi obtained control and responsibility over the OTC NDA." *Id.* ¶ 108.

11.  The Complaint is also rife with liability allegations that specifically identify the Removing Defendants as culpable parties who supposedly knew that Zantac was contaminated with NDMA. For example (emphases added):

- The Complaint references SEC filings from Sanofi and GSK disclosing that "DOJ is investigating whether *Glaxo* and *Sanofi SA* failed to disclose information to the federal government regarding the presence of NDMA in their" Zantac. *Id.* ¶ 127.

- The Complaint cites an article by Dr. de Flora for the proposition that experiments disclosed the presence of NDMA, and then alleges "*GSK* knew of Dr. de Flora's publication because, two weeks later, GSK responded in The Lancet." *Id.* ¶ 163.

- The Complaint alleges that "*GSK* knew . . . that ranitidine could react with nitrite in the human stomach to form NDMA and, at the same time, that long-term use of ranitidine could lead to elevated levels of nitrite in the human stomach." *Id.* ¶ 166.

12.  The Complaint's allegations directed at the Doe Defendants clearly and unambiguously refer to the parties which manufactured, developed, and labeled Zantac—namely, the Removing Defendants. Plaintiffs allege that "DOES 1 through 100 . . . engaged in," *inter alia*,

"the . . . *manufacturing* . . . of Ranitidine-Containing Drugs." *Id.* ¶ 86 (emphasis added).  Plaintiffs allege that the Doe Defendants were "engaged in the business of *researching, developing, designing, licensing, [and] manufacturing*" ranitidine.  *Id.* ¶ 88 (emphasis added).  An entire section of the Complaint is entitled "Doe Defendants Made False Statements in the Labeling of Their Ranitidine-Containing Products."  *Id.* at 45.  That section explains that "[a] *manufacturer* is required to give adequate directions for the use of a pharmaceutical drug."  *Id.* ¶ 202 (emphasis added).  The Doe allegations are therefore plainly directed at the Removing Defendants.

13.     Though the Complaint itself leaves no doubt that the Removing Defendants are the parties misnamed as Doe Defendants, the course of conduct by Plaintiffs' counsel confirms it. Plaintiffs' counsel previously filed 42 nearly identical complaints in California state court *specifically naming the Removing Defendants*, as well as the Retailer Defendants, in May 2020. *See, e.g.*, Dkt. 1-1, *Dudley v. GlaxoSmithKline LLC*, No. 3:20-cv-03913-SI (N.D. Cal. June 15, 2020).   Those cases were removed to the Northern District of California based on diversity jurisdiction, *see, e.g.*, *Dudley* June 15, 2020 Dkt. 1, and subsequently stayed by Judge Illston, who concluded that "it is appropriate that Judge Rosenberg resolve the motions for remand" if the JPML transfers these cases to her (which it did).  *Dudley* June 30, 2020 Dkt. 35.  Plaintiffs' use of the Doe Defendant procedure is a transparent effort to avoid a similar removal, while maintaining the same substantive claims against the same manufacturer defendants under the fiction that they are Doe Defendants.

14.     Removing Defendants accordingly qualify as "defendants" under 28 U.S.C. § 1441(a) who hold authority to remove this case despite Plaintiffs' counsel wrongly naming them as Doe Defendants. *See Parkview Edge Props. LLC v. Dumalao*, 2014 WL 6808625, at *1 (N.D. Cal. Dec. 2, 2014) (doe defendant removing case); *Skyline Vista Equities, LLC v. Scott*, 2012 WL 4899694, at *1 (C.D. Cal. Oct. 15, 2012) (same); *Neng Por*, 2011 WL 2746191, at *1, *4-5 (granting John Doe defendants' motion to dismiss after they removed); *Avon Grp. LLC*, 2012 WL 2886697, at *2 n.1 (*Neng Por* "implicitly allowed" "John Doe Defendants [to] remove a case from state court").

15.     Because their true identity is clear, Removing Defendants' citizenship must be considered for purposes of diversity jurisdiction notwithstanding Plaintiffs referring to them as Doe

Defendants in the case caption.  Citizenship of Doe Defendants is considered for diversity purposes where "'Plaintiffs' description of Doe defendants or their activities is specific enough as to suggest their identity, citizenship, or relationship to the action.'" *Barnes v. Costco Wholesale Corp.*, 2019 WL 6608735, at *2-3 (C.D. Cal. Dec. 4, 2019) (rejecting "overly simplistic" argument that 28 U.S.C. § 1441(b)(1) "requires the [c]ourt to disregard the Doe Employee's citizenship"; finding instead that "persuasive authority indicates that the [c]ourt may consider the Doe Employee's citizenship for purposes of diversity jurisdiction"); *see also Johnson v. Starbucks Corp.*, 2020 WL 4365416, at *3 (C.D. Cal. July 30, 2020) (holding that doe defendants' "citizenship should not be disregarded" despite 28 U.S.C. § 1441(b)(1) because the amended complaint "alleges sufficient facts regarding [d]oe [d]efendants to establish they are real parties with a relationship to this action and not wholly fictitious"); *Sandoval*, 2018 WL 1989528, at *3 ("[W]hen a plaintiff's allegations give a definite clue about the identity of a fictitious defendant . . . the court *should* consider the citizenship of the fictitious defendant." (emphasis in original; citation omitted)).  That standard is clearly met here.

16.     In addition and in the alternative, Removing Defendants are the real parties in interest in this case, which were either intentionally or "mistakenly omitted from the initial complaint." *HSBC Bank USA v. Mohanna*, 2015 WL 4776236, at *4 (N.D. Cal. Aug. 13, 2015).  As the real parties in interest, Removing Defendants "may remove to federal court even before [they] [are] named as a defendant." *Id.*  This "concept of a 'real party defendant in interest' . . . is an important aspect of removal jurisprudence, despite the absence of the phrase from Rule 17 or elsewhere in the Federal Rules." *LaRusso v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 97 (2d Cir. 2014).

**B.      There Is Complete Diversity Between The Proper Defendants And Numerous Plaintiffs**

17.     There is complete diversity between the Removing Defendants and numerous Plaintiffs in this multiple-Plaintiff action.

18.     Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Ridgefield, Connecticut. Boehringer Ingelheim Pharmaceuticals, Inc. is, therefore, a citizen of Delaware and Connecticut.

19.     Defendant Boehringer Ingelheim USA Corporation is a corporation organized under the laws of Delaware with its principal place of business in Ridgefield, Connecticut.  Boehringer Ingelheim USA Corporation is, therefore, a citizen of Delaware and Connecticut.

20.     Defendant GlaxoSmithKline LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Wilmington, Delaware.  Its sole member is GlaxoSmithKline Holdings (America) Inc., a corporation organized under the laws of Delaware with its principal place of business in in Wilmington, Delaware.  *See* Attachment to Corp. Disclosure Statement, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL No. 2924, Dkt. 43-1. GlaxoSmithKline LLC is, therefore, a citizen of Delaware.

21.     Defendant Pfizer Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Pfizer Inc. is, therefore, a citizen of Delaware and New York.

22.     Defendant Sanofi US Services Inc. is a corporation organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.  Sanofi US Services Inc. is, therefore, a citizen of Delaware and New Jersey.

23.     Defendant Sanofi-Aventis U.S. LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Bridgewater, New Jersey.  The sole member of Sanofi-Aventis U.S. LLC is Sanofi US Services Inc., a Delaware corporation with its principal place of business in New Jersey.  Defendant Sanofi-Aventis U.S. LLC is, is therefore, a citizen of Delaware and New Jersey.

24.     Of the 55 Plaintiffs, 6 are citizens of California (Baker, Dudum, Eubanks, Fast, Gil, Smith), 3 are citizens of Washington (Calhoun, Ellingsen, Marx), 1 is a citizen of Utah (Jensen), 1 is a citizen of Wyoming (Perue), 1 is a citizen of Arizona (Bremenour), 1 is a citizen of Florida (Barthel), and 1 is a citizen of Ohio (Pewett), based on Removing Defendants' diligent inquiry using publicly available information.  At least 7 additional Plaintiffs are citizens of one or another state that is different from that of any Removing Defendant—Cardinal (New Hampshire, Massachusetts, or Wisconsin), Tada (Nevada or Washington), Nichogi (New Mexico or Virginia), Stiers (North Carolina, Minnesota, Nevada, Arizona, Kentucky, Ohio, or Indiana), Motoyka (Arizona, Nevada,

or Texas), Mariner (Utah, Florida, or Pennsylvania), Dykes (California, Louisiana, Georgia, Texas, Virginia, Mississippi, Alabama, Massachusetts, Florida)—but Removing Defendants have been unable to determine which state exactly based on their diligent inquiry using publicly available information.

26.    Because these Plaintiffs and the proper defendants are citizens of different states, diversity exists between them.  *See* 28 U.S.C. §§ 1332, 1441.

**C.    The Court Should Order Discovery As To The Citizenship of the Remaining Plaintiffs, and Sever And Remand Only Those Plaintiffs Who Are Non-Diverse From Removing Defendants.**

26.    Plaintiffs next attempt to defeat diversity jurisdiction by lumping together a multitude of unrelated Plaintiffs in a single Complaint, and then omitting from the Complaint any allegations as to the citizenship of those Plaintiffs.  By doing so, Plaintiffs hope that the presence of any non-diverse Plaintiff or Plaintiff whose citizenship is unknown to Removing Defendants will prevent removal of the entire multiple-plaintiff Complaint.  This gambit should not interfere with federal jurisdiction over the claims of Plaintiffs which are diverse from the Removing Defendants.

27.    ***First***, as to any Plaintiffs whose citizenship is not known,[3] the Court should order limited jurisdictional discovery to determine their citizenship, or direct Plaintiffs to identify their citizenship.   *See Berkeley Research Grp.*, 2017 WL 952680, at *2 ("'Discovery may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary.'" (citation omitted)); *id.* (holding remand motion "in abeyance pending limited jurisdictional discovery" on plaintiff's citizenship because "[plaintiff], unlike defendants, is capable of providing substantial evidence that its Utah members are in fact domiciled in Utah" and plaintiff's "unnecessarily cryptic declarations leave [the court] needing 'a more satisfactory showing of the facts'"); *Murchison Capital Partners*, 2013 WL 3328694, at *1, *4 (granting request for jurisdictional discovery to determine citizenship of plaintiffs because court could not "determine whether complete diversity exists" after they "refused

---

[3] Bonvino, Jack, Matthews, Ali, G. Kelly, Scarsciotti, Hasson, Acosta, Weiner, Carr, Yu, Williams, E. Johnson, Woods, Newkirk, Matheny, Peloquin, Goolsby, Quick, Davis, L. Kelly, Harris, M. Johnson, S. Kelly, Trillo-Robinson, Lee, Hartley, Diaz, Sandowsky, Woods, Fleeman, Villa, Looney, Karst.

to . . . provide information in its possession and its control"); *CSDVRS, LLC v. Purple Commc'ns, Inc.*, 2013 WL 4763948, at *1 (M.D. Fla. Sept. 4, 2013) (deferring ruling on motion to remand because removing defendant was "entitled to jurisdictional discovery" on "the issue of diversity of citizenship").    Indeed, courts supervising mass tort litigations have repeatedly ordered such discovery when needed to ascertain jurisdiction.  *In re Fluoroquinolone Prods. Liab. Litig.*, 2016 WL 4154338, at *2 (D. Minn. Aug. 5, 2016) (deferring ruling on remand motion until plaintiffs provided initial materials showing that non-diverse defendant distributed product at issue); Dkt. 620, *In re Taxotere Prods. Liab. Litig.*, No. 16-02740 (E.D. La. July 11, 2017)  (deferring consideration of remand motions, and ordering plaintiffs "to provide the [c]ourt with individualized statements regarding what information exists as to [non-diverse California defendant's] alleged connection to each [p]laintiff").

28.    ***Second***, the Court should sever and drop from the action any Plaintiff whom discovery reveals to be of non-diverse citizenship from the Removing Defendants.  Federal courts are authorized to use Rule 21 to perfect their diversity jurisdiction by dropping a nondiverse, dispensable party.  Rule 21 states:  "On motion or on its own, the court may at any time, on just terms, add or drop a party.  The court may also sever any claim against a party."  *See Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1142 (9th Cir. 2003) ("[Rule 21] is viewed as a grant of 'discretionary power [to the federal court] to perfect its diversity jurisdiction by dropping a nondiverse party provided the nondiverse party is not indispensable to the action under Rule 19.'" (citation omitted)); *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 404 (3d Cir. 2017) (discussing Rule 21 and stating that, "[i]n some cases, severance clearly will be warranted to preserve federal diversity jurisdiction"); *Koehler v. Dodwell*, 152 F.3d 304, 308 (4th Cir. 1998) (construing Rule 21 and stating that "a party or claim whose presence deprives the court of jurisdiction may be dropped or severed from the action"); *Cuviello v. Feld Entm't, Inc.*, 304 F.R.D. 585, 593-94 (N.D. Cal. 2015) (relying on Rule 21 to order dismissal without prejudice of dispensable nondiverse party to "perfect [the court's] diversity jurisdiction"); *see also* Wright & Miller, 7 Fed. Prac. & Proc. Civ. § 1685 (2020) ("Courts frequently employ [Rule] 21 to preserve diversity jurisdiction over a case by dropping a nondiverse party if the party's presence in the action is not required under [Rule] 19.").

NOTICE OF REMOVAL

29.    District courts repeatedly have relied on Rule 21 to sever nondiverse parties in removed cases and assert diversity jurisdiction over the remaining parties.  For example, one court denied a remand motion, holding that a diversity-destroying plaintiff "was improvidently joined" and dismissing that plaintiff "as a misjoined party under Rule 21." *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 490 (E.D. Va. 2003).  Likewise, a MDL court presiding over products liability cases relied on Rule 20 to hold that diversity-destroying plaintiffs were misjoined and Rule 21 to sever those plaintiffs from their diverse co-plaintiffs, thereby "preserv[ing] the defendants' right to removal" as to the claims asserted by the diverse plaintiffs.  *In re Rezulin Prod. Liab. Litig.*, 168 F. Supp. 2d 136, 144-48, 153 (S.D.N.Y. 2001).  Other district courts have exercised their Rule 21 discretion in similar fashion to retain jurisdiction over certain parties and claims while severing other parties and claims.  *See, e.g.*, *Sullivan v. Calvert Mem. Hosp.*, 117 F. Supp. 3d 702, 704, 707 (D. Md. 2015) ("[t]he court has discretion, under [Rule] 21, to drop nondiverse parties to achieve complete diversity"; severing and remanding claims asserted against nondiverse defendants and retaining jurisdiction over claims asserted against removing defendants); *Mayfield v. London Women's Care, PLLC*, 2015 WL 3440492, at *3, *5-6 (E.D. Ky. May 28, 2015) ("Rule 21 can be used to sever a dispensable, nondiverse party in order to preserve federal jurisdiction"; severing and remanding claims asserted against nondiverse defendants and retaining jurisdiction over claims asserted against removing defendant); *Cooke-Bates v. Bayer Corp.*, 2010 WL 3984830, at *4 (E.D. Va. Oct. 8, 2010) ("district courts have considerable discretion to sever parties under Rule 21"; severing and remanding claims asserted against nondiverse defendant and retain jurisdiction over remaining claims); *Joseph v. Baxter Int'l, Inc.*, 614 F. Supp. 2d 868, 872-75 (N.D. Ohio 2009) (ordering severance based on Rule 21 and remanding claims asserted against nondiverse defendants and retaining jurisdiction over claims asserted against removing defendant); *see also* Wright & Miller, 7 Fed. Prac. & Proc. Civ. § 1685 (2020) (courts "have used Rule 21 to drop a party who was joined in an action for the purpose of preventing removal to a federal court").

30.    Such severance is particularly appropriate here because it aligns with pretrial orders ("PTOs") already entered by Judge Rosenberg in the Zantac MDL.  In PTOs 11 and 31, Judge Rosenberg barred the direct-filing of multi-plaintiff complaints, and required any plaintiff who had

asserted claims in a multi-plaintiff complaint to refile an individual complaint. *See* MDL Dkt. 422, 876. Thus, if the Court severs and remands the claims of non-diverse Plaintiffs, it would simply be putting into effect the same procedure that is already in place for plaintiffs in the MDL.

31. **Third,** the Court may alternatively ignore the citizenship of any Plaintiff who is non-diverse from Removing Defendants under the fraudulent misjoinder doctrine. First articulated by the Eleventh Circuit in *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353 (11th Cir. 1996), *abrogated on other grounds*, *Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000), this doctrine allows the Court to ignore the citizenship of non-diverse plaintiffs who are improperly joined with diverse plaintiffs. Though the Ninth Circuit has not published an opinion adopting or rejecting the doctrine, the court noted its existence in an unpublished case and "assume[d], without deciding, that this [C]ircuit would accept the doctrines of fraudulent and egregious joinder as applied to plaintiffs." *Cal. Dump Truck Owners Ass'n v. Cummins Engine Co.*, 24 F. App'x 727, 729 (9th Cir. 2001).

32. Numerous district courts have applied this doctrine in pharmaceutical cases, holding that plaintiffs who fail to allege that they received the product from the same source, at the same point in time, for similar periods of time, resulting in similar injuries, were fraudulently misjoined. *See Greene v. Wyeth*, 344 F. Supp. 2d 674, 683-85 (D. Nev. 2004) (ordering severance and denying remand motion for certain plaintiffs where "Wyeth Defendants' statutory right of removal has been frustrated by Plaintiffs' improper joinder"); *In re Rezulin,* 168 F. Supp. 2d at 148 ("[A]s the plaintiffs have been misjoined, and the misjoinder of plaintiff Dupree in particular destroys diversity, the Court will sever her action for purposes of maintaining the defendants' right to removal of the remainder of the action.")*; In re Diet Drugs Prods. Liab. Litig.,* 294 F. Supp. 2d 667, 679 (E.D. Pa. 2003) (finding misjoinder and severing claims where "plaintiffs reside[d] in various states throughout the country, and were prescribed different diet drugs by different doctors at different times."); *In re Diet Drug Prods. Liab. Litig.,* 1999 WL 554584, at *3-4 (E.D. Pa. July 16, 1999) (dismissing non-diverse plaintiffs' claims and finding that plaintiffs who purchased pharmaceutical products from different sources were not properly joined); *In re Baycol Prods. Litig.,* MDL No. 1431, 2003 WL 22341303, at *4 (D. Minn. 2003) (severing the misjoined plaintiff after concluding

NOTICE OF REMOVAL

that "these claims have been misjoined, and that such misjoinder should not defeat diversity jurisdiction."); *see also Lyons v. Am. Tobacco Co.*, 1997 WL 809677, at *4 (S.D. Ala. Sept. 30, 1997) (dismissing non-diverse North Carolina plaintiffs' claims as fraudulently misjoined because they were "inherently separate and distinct from the claims asserted by the Alabama plaintiff").

33.    The same holds true here.  Plaintiffs attempt to join in one action 51 individuals from different states without any connection alleged between them except that they all ingested Zantac and claim to have developed cancer.  Plaintiffs' claims do not arise out of the same "transaction" or "series of transactions" as required for proper joinder.  *See* Fed. R. Civ. P. 20(a)(1).[4]  Plaintiffs do not allege that they received Zantac from the same source. They do not allege a common condition for which they took Zantac. They do not allege similarities in length of exposure to Zantac.  They do not all allege the same type of cancer arising out their alleged use of Zantac.[5]

34.    Plaintiffs' misjoinder frustrates both the underlying purpose of the joinder rules and the Removing Defendants' right to removal.  *In re Rezulin Prods. Liab. Litig.*, 2002 WL 31496228, at *1 (S.D.N.Y. Nov. 7, 2002) ("Joinder 'of several plaintiffs who have no connection to each other in no way promotes trial convenience or expedites the adjudication of the asserted claims.'") (citation omitted).  As Plaintiffs are fraudulently misjoined, this Court should sever the claims of the non-diverse Plaintiffs and retain jurisdiction over the claims of the remaining diverse Plaintiffs.

---

[4] Federal and California joinder rules are substantially the same.  Under both, joinder of plaintiffs is appropriate only where the matters to be litigated arise from the "same transaction" or "series of transactions" and they involve any common "question of law or fact."  *Compare, e.g.*, Fed. R. Civ. P. 20(a)(1), *with* Cal. Civ. Proc. Code § 378; *see also David v. Medtronic, Inc.*, 237 Cal. App. 4th 734, 741 (2015) ("Plaintiffs may be joined when they assert a right to relief 'in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.'" (citation omitted)).

[5] *See Alday v. Organon USA, Inc.,* 2009 WL 3531802, at *1-2 (E.D. Mo. Oct. 27, 2009) (severing and dismissing plaintiffs because their injures are not "all the same" and "[e]ach [p]laintiff was injured at different times in different states allegedly from their use of NuvaRing that was presumably prescribed by different healthcare providers"); *Boschert v. Pfizer, Inc.*, 2009 WL 1383183, at *3 (E.D. Mo. May 14, 2009) (concluding that "the mere fact the four plaintiffs took Chantix at some point in time and suffered some sort of mental or behavioral side-effect is not enough . . . to satisfy the same transaction or occurrence requirement" because "the prescriptions were provided through different health care providers, . . . the drug was taken at different times for various durations," plaintiffs' "alleged symptoms are not the same and their medical histories appear to have varied greatly," and "plaintiffs are all from different states"); *Cumba v. Merck & Co., Inc.*, 2009 WL 1351462, at *1 (D.N.J. May 12, 2009) ("[I]n addition to being linked by the same drug and type of injury, plaintiffs must demonstrate similarities with respect to, *inter alia*, the source of the drug, the length of exposure to the drug, the type of exposure, the type of resulting injury, and the plaintiffs' physical state at the time of ingestion.").

**II.    The Retailer Defendants Are Fraudulently Joined**

35.    The Retailer Defendants are fraudulently joined, and their California citizenship should therefore be disregarded for purposes of removal.

36.    A defendant is fraudulently joined and its presence in the lawsuit is ignored for purposes of determining diversity where there is no "possibility that a state court would find that the complaint states a cause of action" against it. *Grancare, LLC v. Thrower by & through Mills*, 889 F.3d 543, 549 (9th Cir. 2018). *See also Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001) (a defendant is fraudulently joined "'[i]f the plaintiff fails to state a cause of action against the resident defendant, and the failure is obvious according to the settled rules of the state'") (citation omitted)); *Ritchey v. Upjohn Drug Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998) (same).

37.    Here, the Retailer Defendants are fraudulently joined because: (1) they cannot unilaterally change an FDA-approved label or alter the highly regulated manufacturing processes as mere sellers of Ranitidine-Containing Drugs, and the claims against them are accordingly preempted; and (2) Plaintiffs do not plead a cognizable negligence action against the Retailer Defendants.

**A.    Plaintiffs' Strict Liability Claims Against Retailer Defendants Are Preempted.**

38.    Plaintiffs' strict products liability claims, under failure-to-warn and manufacturing-defect theories, against the Retailer Defendants are preempted by federal law.  As a result, there is no "possibility that a state court would find that the complaint states a cause of action" against the retailers. *Grancare, LLC v. Thrower by & through Mills*, 889 F.3d 543, 549 (9th Cir. 2018).

39.    In *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011), the Supreme Court held that claims involving an FDA-approved product are preempted under federal law when a defendant cannot unilaterally satisfy state-law duties without FDA's prior approval.  *Id.* at 623–24 ("[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which in turn is dependent on the exercise of judgment by a federal agency, that party cannot ***independently*** satisfy those state duties for pre-emption purposes." (emphasis added)); *see also Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013).  In *Mensing*, the Supreme Court announced this preemption principle in the context of product liability actions against manufacturers of generic

drugs. *Mensing*, 564 U.S. at 610. The manufacturers argued that, under federal drug regulations, they are "prevented . . . from independently changing their generic drugs' safety labels." *Id*. at 617. Consequently, they asserted, holding them liable under state law for failure to "adequately and safely label their products," would directly conflict with labeling requirements under federal law. *Id*. The Supreme Court agreed: Because generic manufacturers are unable to comply with both state and federal law, state failure-to-warn claims against generic drug manufacturers must be preempted. *Id*. at 618–620, 614 ("If the Manufacturers had independently changed their labels to satisfy their state-law duty [to attach a safer label], they would have violated federal law.").

40.    The same preemption analysis that the Supreme Court articulated in *Mensing* bars claims against pharmaceutical distributors or retailers that stand even further removed than generic manufacturers from the ability to change drug labeling that the FDA has approved. Only the party that submits the New Drug Application (the "NDA") to obtain FDA approval to market a drug can seek to change the drug's labeling after initial approval. 21 C.F.R. § 314.71(a); *id*. § 314.70(a)(4) ("The applicant must promptly revise all promotional labeling and advertising to make it consistent with any labeling change implemented . . . ."). Here, the Retailer Defendants are not, and never were, the holders of the Zantac NDA. Rather, they are named solely in their capacity as retailers that sold FDA-approved products manufactured by other parties.[6] Therefore, they had no authority to unilaterally change the product's labeling.

41.    In fact, had the Retailer Defendants provided warnings about risks not included in Zantac's approved product labeling, they would have been breaking federal law, and would be subject to potential civil and/or criminal penalties for "misbranding." 21 U.S.C. §§ 333, 334. FDA regulations on misbranding prohibit any person, including a pharmaceutical distributor, from issuing any warning that is not consistent with the drug's FDA-approved labeling. 21 C.F.R.

---

[6] Plaintiffs allege that, Retailer Defendant Safeway Inc., incorrectly identified in this action as "Safeway Health, Inc.," has "labeled, distributed, and marketed generic Ranitidine-Containing Drugs manufactured by Perrigo Company, plc and Dr. Reddy's Laboratories Ltd on behalf of Defendant Safeway, Inc. and labeled and marketed by Safeway Health, Inc. as 'Safeway Care' products." Compl. ¶ 79. Insofar as the Complaint could be interpreted to include a claim against Retailer Defendant Safeway as a seller of its own generic version of ranitidine under the "Safeway Care" name, Safeway would still have no ability to alter the FDA-approved labeling for ranitidine medications whether sold under the name "Safeway Care" or any other name. *Mensing*, 564 U.S. at 617. But Plaintiffs do ***not*** allege they ingested Safeway Care products.

§ 201.100(d)(1).  Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* (the "FDCA"), when FDA approves a drug for marketing, it also approves the drug's labeling, including information about the drug's potential risks and benefits.  21 U.S.C. § 355(d).

42.     The FDCA and its implementing regulations provide that a drug is misbranded if its labeling is "false and misleading in any particular."  *Id.* § 352(a); *id.* § 321(n); *id.* § 331(a), (b), (k); 21 C.F.R § 201.6(a).  A statement about a drug's risks would be considered "false and misleading" if FDA has not found it to be properly substantiated.  40 Fed. Reg. 28,584 (1975) ("[A] drug is misbranded if its labeling makes claims that have not been properly substantiated.").  By definition, a distributor's or retailer's unapproved warning that is inconsistent with the approved drug labeling would not have been found to be substantiated by FDA and, thus, would constitute misbranding.[7]

43.     Applying this Supreme Court precedent, numerous federal courts have accordingly held that failure-to-warn claims asserted against pharmaceutical distributors are preempted because the distributors cannot change approved product labeling.  *See, e.g.*, *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 2012 WL 181411, at *3 (D.N.J. Jan. 17, 2012) ("As a distributor of Fosamax, Watson has no power to change Fosamax labeling.  That power lies with the applicant who filed the New Drug Application . . . seeking approval to market Fosamax."); *Pierik v. GE Healthcare Inc.*, 2019 WL 4686551, at *1 (N.D. Ill. June 18, 2019) ("As McKesson is alleged to be a distributor rather than a manufacturer of Omniscan and MultiHance, I cannot draw a reasonable inference that McKesson had the ability to modify the warning labels of those drugs.  Plaintiffs' claims against McKesson are preempted."); *Smith v. GE Healthcare, Inc.*, 2019 WL 4565246 (W.D. La. Sept. 4, 2019) (finding failure-to-warn claims preempted because "McKesson has no authority to unilaterally change or add to the Omniscan labeling" as a pharmaceutical distributor); *Brazil v. Janssen Research & Dev. LLC*, 196 F. Supp. 3d 1351, 1364–65 (N.D. Ga. 2016) ("A distributor, even of a brand name drug, has no power to change . . . labeling. That power lies with the applicant

---

[7] Plaintiffs' allegation that the alleged failure to warn was not limited to the Ranitidine-Containing Drugs' labeling does not save this claim.  Compl. ¶ 247.  The term "labeling" under FDA regulations is broad and includes "all labels and other written, printed, or graphic matter."  21 U.S.C. § 321(m); *see also* 21 C.F.R. § 1.3 (same).  Thus, all materials disseminated by pharmaceutical distributors about a drug's risks and benefits, including promotional and other materials, must be "consistent with and not contrary to . . . the approved or permitted labeling."  21 C.F.R. § 201.100(d)(1); 73 Fed. Reg. 2848, 2850 n.3 (2008) ("Federal law governs not only what information must appear in labeling, but also what information may not appear.").

who filed the New Drug Application.") (citations and quotations omitted); *In re Yasmin & Yaz Prods. Liab. Litig.*, 2014 WL 1632149, at *6 (S.D. Ill. Apr. 24, 2014) ("Under applicable federal regulations, generic distributors have no more authority than generic manufacturers to alter a drug's composition, label, or design.  Accordingly, the principles announced in *Mensing* . . . are equally applicable to generic distributors.").  Supreme Court precedent mandates the same result here.

44.    Plaintiffs' manufacturing-defect claim against the Retailer Defendants is preempted for the same reason as Plaintiffs' failure-to-warn claim:  under federal law, the Retailer Defendants could not have altered the manufacturing of Zantac.  If the Retailer Defendants manufactured Zantac in a different manner, they would be liable under the FDCA for the introduction into interstate commerce of an unapproved and misbranded new drug.  *See* 21 U.S.C. § 331(a) and (d).

45.    FDA highly regulates the manufacturing of drugs and associated processes.  *See* FDCA § 505; 21 U.S.C. § 355.  As a result, the NDA holder must describe and disclose to FDA all manufacturers of its products.  *See* 21 U.S.C. § 355(b)(1)(D) (NDA must contain "a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug."); 21 C.F.R. § 314.50(d)(i) (NDA must contain "a detailed technical chemistry, manufacturing, and controls section," detailing, among other things "the name and address of the drug substance's manufacturer" as well as "the name and address of each manufacturer of the drug product; [and] a description of the manufacturing and packaging procedures and in-process controls for the drug product.").  To add or change a manufacturer, the NDA holder must accordingly submit a supplement to its NDA.  *See* 21 C.F.R. § 314.70(a).  Just as only the NDA holder can change drug labeling, only the NDA holder has authority to submit a supplement to its NDA to add or change a manufacturer.  *See id.* § 314.71(a) ("Only the applicant may submit a supplement to an application.").  Manufacturing a drug out of compliance with an approved NDA causes the product to be an unapproved new drug in violation of the FDCA.  21 U.S.C. § 331(d) (prohibiting "[t]he introduction or delivery for introduction into interstate commerce of any article in violation of section . . . 505 (21 U.S.C. § 355)").

46.    None of the Retailer Defendants was identified in the Zantac NDA as an authorized manufacturer of Zantac or listed and registered with FDA to manufacture Zantac.  Nor did any

Retailer Defendant have the authority to designate itself as a manufacturer pursuant to an approved NDA because none is an NDA holder. Had a Retailer Defendant nevertheless manufactured and sold Zantac in a different manner to avoid alleged state-law liability, that would have violated the FDCA by introducing an unapproved new drug into interstate commerce. *See* 21 U.S.C. § 331(d) ("The following acts are prohibited: . . . The introduction or delivery for introduction into interstate commerce of any article in violation of section . . . 505"). In addition, manufacturing Zantac without appropriately registering and listing with FDA would cause the resulting product to be misbranded. *Id.* § 352(o) (A drug or device shall be deemed misbranded "[i]f it was manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered"). Both actions would subject retailers to civil and/or criminal penalties. *See id.* § 333(a); *id.* § 303(a)(1) ("Any person who violates a provision section 301 shall be imprisoned for not more than one year or fined not more than $1,000, or both."). Thus, under the settled preemption principles articulated in *Mensing*, there is no "possibility that a state court would find that the complaint states a cause of action" against the Retailer Defendants. *Grancare, LLC*, 889 F.3d at 549 (quotations omitted).

47. Some district courts have remanded cases where removals were based on preemption of similar claims against distributors, though acknowledging the argument's logic.[8] These cases are not binding, and the Court need not follow them.

48. Nor is the reasoning of those cases persuasive. Most invoked *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1044 (9th Cir. 2009), for the proposition that it is inappropriate to examine the affirmative defense of preemption in the context of a motion to remand. But *Hunter* involved a common defense that would "effectively decide[] the entire case" by barring claims against ***all***

---

[8] *See Geisse v. Bayer HealthCare Pharm. Inc.,* 2019 WL 1239854, at *3 (N.D. Cal. Mar. 18, 2019) ("[P]reemption goes to the merits of the plaintiff's case and entails a degree of analysis that does not render a state law claim obviously barred or frivolous for fraudulent joinder purposes."); *Dodich v. Pfizer Inc.*, No. C 18-02764 WHA, 2018 WL 3584484, at *3 (N.D. Cal. July 26, 2018) ("Although logical, neither *Mensing* nor *Bartlett* specifically dealt with distributors and defendants do not identify binding authority extending the decisions. As such, it is not manifest that plaintiff has no possible claim against McKesson under California law."); *Hatherley v. Pfizer, Inc.*, 2013 WL 3354458, at *6 (E.D. Cal. July 3, 2013) ("[W]hile the argument that distributors of brand name drugs are the same as generic manufacturers may be persuasive, 'unless and until this rational is extended,' it is not obvious that plaintiffs have no claim against McKesson under California law because of a preemption defense." (emphasis and citations omitted)); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 2018 WL 6258903, at *5 (N.D. Fla. Nov. 8, 2018) (noting the arguments' "conceptual, and frankly, practical appeal").

defendants. *Id.* at 1045 (internal quotation marks omitted). Not so here. Although the Removing Defendants have a variety of dispositive defenses (including some based on different federal preemption arguments), the claims against the Retailer Defendants are barred here for a different reason that does not apply to the Removing Defendants: the Retailer Defendants never had labeling or manufacturing responsibility for the product, making it impossible for them to unilaterally change the label or manufacturing of the product. *Cf. id.* at 1044.

49.     In addition, no searching inquiry into the merits of the case is required to find that the claims against the Retailer Defendants are preempted. *Hunter*, 582 F.3d at 1044 (explaining that only a "summary inquiry [was] appropriate" to determine whether an in-state defendant was fraudulently joined) (citations and quotations omitted). Here, preemption is a legal defense that applies because of the simple and undisputed fact that the Retailer Defendants never held regulatory authority to alter the labeling or manufacture of the product. The Court need not review or determine any facts concerning the Retailer Defendants' conduct or the scientific issues involved in the litigation to assess preemption.

50.     Indeed, Removing Defendants have already successfully urged this basis for removal in the Zantac litigation. An action was filed in Florida state court against some of the instant defendants and a non-diverse distributor, Publix. As here, the plaintiff brought claims against all defendants for strict products liability, and the defendants removed the case to federal court on the basis of fraudulent joinder. Following removal, the plaintiff did not oppose defendants' removal and, instead, voluntarily dismissed Publix from the case. That case is now coordinated in the MDL. *See* Dkt. 1, *Galimidi v. Sanofi US Servs. Inc.*, No. 1:10-cv-24395-BB (S.D. Fla. Oct. 23, 2019); Dkt. 259, *In re: Zantac (Ranitidine) Prods. Liab. Litig.*, No. 9:20-md-2924 (S.D. Fla. Mar. 6, 2020).

**B.    Plaintiffs Fail To Plead A Cognizable Negligence Claim Against The Retailer Defendants Under California Law.**

51.     There is no possibility that Plaintiffs could prevail on their negligence claim against the Retailer Defendants under California law because a seller of a product does not have a duty to investigate or test products stocked on its shelves for unforeseen risks.

52.     The Complaint asserts that in January 2020, an FDA-certified pharmaceutical testing laboratory called Emery Pharma conducted tests revealing that NDMA accumulates in Ranitidine-

Containing Drugs exposed to elevated temperatures.  *See* Compl. ¶ 191.  It further alleges that subsequent FDA testing revealed that NDMA levels could increase even under normal storage conditions.  *Id.* ¶ 193.

53.    The thrust of the Complaint is that the Retailer Defendants were negligent for not themselves earlier investigating and testing Ranitidine-Containing Drugs to uncover these alleged facts, and accordingly for storing the product in conditions that allegedly led to NDMA formation. *See, e.g.*, Compl. ¶ 267 ("Defendants acted below the standard of care by storing and dispensing Ranitidine-Containing Drugs to Plaintiffs without first undertaking efforts to ensure that the drugs were safe for human use by, for example, consulting the available medical literature evidencing the potential human health dangers associated with the storage of Ranitidine-Containing Drugs and the formation of NDMA within Ranitidine-Containing Drugs when the drugs are stored and/or shelved at particular temperatures.").

54.    Plaintiffs' claim that Retailer Defendants should have determined that Ranitidine-Containing Drugs degrade and form NDMA when stored at particular temperatures or lengths of time seeks to impose a duty to investigate and test that California law does not recognize.  California law is clear that "a dealer who purchases and sells an article in common and general use, in the usual course of trade, without knowledge of its dangerous qualities ***is not under duty*** to exercise ordinary care to discover whether it is dangerous or not."  *See Sears*, 121 F.2d at 600 (applying California law) (emphasis added and citations omitted); *see also Tourte v. Horton Mfg. Co.*, 108 Cal. App. 22, 24 (1930) (affirming holding that seller of a washing machine had no duty to examine the product where there was a latent defect unknown to the seller).  *Cf. Burgess v. Montgomery Ward & Co.*, 264 F.2d 495, 497 (10th Cir. 1959) (holding that it would be "completely unreasonable to expect the shopkeeper to perform the inspection or test which would have revealed to an expert the defect in the ladder rail"); *Ziglar v. E. I. Du Pont De Nemours & Co.*, 152, 280 S.E.2d 510, 514 (N.C. App. 1981) (holding that retailer of inherently dangerous toxic substance was under no duty to detect or remedy hidden defect); *Odum v. Gulf Tire & Supply Co.*, 196 F. Supp. 35, 36 (N.D. Fla. 1961) ("a retailer or wholesaler is not under a duty to inspect manufactured articles of a complex nature for defects which are latent"); *Meyer v. Rich's Inc.*, 12 S.E.2d 123, 123 (Ga. App. 1940) (a seller of

men's suits had no duty to analyze the suit chemically and was therefore not liable for buyer's injuries caused by poisonous dye and chemicals in suit).[9]

55.     In *Sears*, for example, after suffering burns from hot water leaking from a rubber hot water bag, plaintiff sued the retailer from whom he purchased the product.  121 F.2d at 599.  An expert testified that the defect in the bag was in the faulty method of construction of the stopper and the socket so that there was a slight leakage of water around the stopper.  *Id.*  The Ninth Circuit explained that the question of whether or not the retailer "should have known of such defects depends upon whether or not the vendor who sells goods manufactured by another is obligated to inspect the goods to determine whether or not they are defective."  *Id.* at 600.  It squarely held that the retailer had no such duty.  *See id.*  Thus, the retailer was under no obligation to inspect the product whether the defects "could only be discovered by such investigations as were made by the experts, or could have been ascertained by the simple test of filling the bag with water and inverting it after the stopper had been screwed into its socket."  *Id.*

56.     Plaintiffs' claim here seeks to impose an even more obviously untenable duty than in *Sears.*  A "simple test" there could have discovered the alleged defect in the hot water bottle.  121 F.2d at 600.  Yet here, Plaintiffs' theory would impose upon every California retailer who sells over-the-counter ("OTC") medications (which, by federal regulation 21 CFR § 211.132, they receive in sealed tamper-resistant packaging) the obligation to conduct their own independent, specialized testing to determine the safety of every lot of every OTC medication stocked on its shelves.

57.     This would be a wholly unprecedented undertaking to require of every California retailer at pains of negligence liability.  Stability testing of pharmaceutical products involves a complex set of procedures that require considerable cost, time, and scientific expertise.  Under federal regulations, for instance, a manufacturer must submit a written protocol that includes, *inter alia*, sample size and test intervals based on statistical criteria for each attribute examined; storage conditions for samples retained for testing; specific test models; testing of the drug product in the

---

[9] Plaintiffs' conclusory and unsupported allegation that the Retailer Defendants failed to follow their own "established practices and procedures" to store the products presupposes that the Retailers owed a duty to investigate and test the products to learn that they could potentially form NDMA through certain storage conditions.  Only if they had conducted such testing and investigation could formation of NDMA be a foreseeable risk of deviating from established storage practices.

same container-closure system as that in which the drug product is marketed; and testing of the drug product at the time of dispensing as directed in the labeling. 21 C.F.R. § 211.166(a)(1)-(5). Such testing must include an adequate number of batches at various storage conditions as defined in the protocol. *Id.* § 211.166(b). Pharmaceutical companies often contract with a Contract Manufacturing Organization to conduct the stability testing. Such testing can cost anywhere from $40,000-$60,000 per product. *See* PCI Synthesis, How to Know When to Toss Your Prescription Drug or Refrigerate It (June 28, 2017), *available at* https://www.pcisynthesis.com/how-to-know-when-to-toss-your-prescription-drug-or-refrigerate-it/.

58.    Yet under Plaintiffs' theory, not just the specific Retailer Defendants here but "mom and pop" grocery or convenience stores throughout the State would be required to conduct such detailed scientific investigations of the pharmaceutical products they sell to guarantee their safety. Nor would Plaintiffs' novel theory be limited to storage conditions for pharmaceuticals; retailers would have to conduct extensive testing of ***all*** of their products to discover any latent dangers and warn against them. *See Burgess*, 264 F.2d at 497 ("Montgomery Ward is operating a retail store, not a testing laboratory. If [it] were obliged to test this [allegedly defective] ladder for structural strength, so is the operator of every retail store in the villages which dot the Kansas prairies."). This is not the "ordinary care" that the law demands of retailers who sell OTC pharmaceuticals, or any other common product for that matter.

59.    The Complaint therefore states no cognizable claim against the Retailer Defendants under California negligence law. The Retailer Defendants are, therefore, fraudulently joined and their California citizenship should be disregarded for purposes of removal.

**III.    The Amount-in-Controversy Requirement Is Satisfied**

60.    Plaintiffs' claims satisfy 28 U.S.C. § 1332(a)'s amount-in-controversy requirement.

61.    "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 554 (2014). "[T]he defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court," and "[e]vidence establishing the amount is required by § 1446(c)(2)(B) only when the plaintiff contests, or the court

1  questions, the defendant's allegation." *Id.* at 553–54.

2      62.    Plaintiffs seek several categories of damages, including compensatory damages,

3  exemplary damages, punitive damages, and attorneys' fees.  *See* Compl. ¶ 274(a)-(b), (d).

4      63.    The Complaint includes three causes of action, and alleges that Plaintiffs' use of

5  Zantac caused Plaintiffs to suffer "significant harm, conscious pain and suffering, physical injury

6  and bodily impairment including, but not limited to cancer, other permanent physical deficits,

7  permanent bodily impairment and other sequelae." *Id.* ¶ 67.  It further asserts that Plaintiffs' injuries

8  required "hospitalizations, in-patient surgeries, medication treatments, and other therapies to

9  address the adverse physical effects and damage" caused by Zantac.  *Id.*

10      64.    Recently, in denying remand, a court of this Circuit found that the amount in

11  controversy was met in a Zantac-related case similarly alleging a cancer injury and seeking

12  compensatory and punitive damages.  There, the Court held that even applying a "conservative

13  estimate" the allegations "on their face" established that the amount in controversy was met.  Dkt.

14  13 at 6-7, *Brooks v. Sanofi*, No. 2:20-cv-565 (D. Nev. Apr. 13, 2018).

15      65.    Courts have similarly found that allegations of serious injury in products liability

16  actions, such as those Plaintiffs make here, support an inference that the amount-in-controversy

17  requirement has been met.  *See Mullaney v. Endogastric Sols. Inc.*, 2011 WL 4975904, at *2 (S.D.

18  Fla. Oct. 19, 2011) (inferring that requirement was met where plaintiff alleged that he underwent

19  "surgical intervention that required additional life saving medical treatment" and suffered "serious,

20  permanent and disabling injuries"); *Geographic Expeditions, Inc. v. Estate of Lhotka*, 599 F.3d

21  1102, 1107–08 (9th Cir. 2010) ("even though the state court complaint does not specify an amount"

22  it satisfied amount-in-controversy requirement by seeking damages for, *inter alia*, wrongful death,

23  loss of consortium, and negligence, as well as funeral, medical and burial expenses); *Campbell v.

24  Bridgestone/Firestone, Inc.*, 2006 WL 707291, at *2 (E.D. Cal. Mar. 17, 2006) (apparent from

25  complaint that amount-in-controversy met where plaintiffs asserted strict products liability,

26  negligence, and breach of warranty claims against multiple defendants and sought compensatory

27  damages, hospital and medical expenses,  general damages, and loss of earning capacity).

28      66.    Based on Plaintiffs' allegations, the amount in controversy exceeds $75,000,

1  exclusive of interest and costs.

2  **IV.    Procedural Requirements of Removal Are Satisfied**

3          67.    This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b). To Removing

4  Defendants' knowledge, the Retailer Defendants have not yet been served with the Complaint. The

5  Removing Defendants have received a copy of, but have not yet been served with, the Complaint.

6          68.    The Northern District of California is the federal judicial district encompassing the

7  Superior Court of the State of California in and for Alameda County, where this suit was originally

8  filed.  Venue is therefore proper in this district under 28 U.S.C. §§ 84(a) and 1441(a).

9          69.    **Intradistrict Assignment.**  Pursuant to Civil L.R. 3-2(c) and (d), this action should

10  be initially assigned to the San Francisco or Oakland Division, because the action arose in Alameda

11  County.  However, this action should then be related to *Dudley v. GlaxoSmithKline LLC*, No. 9:20-

12  cv-81056 (S.D. Fla.) (previously N.D. Cal. 3:20-cv-03913-SI), and consolidated before Judge

13  Illston, who presided over *Dudley* and related cases, pending transfer to the MDL.  Following

14  removal, Removing Defendants will file an Administrative Motion to Consider Whether Cases

15  Should be Related.

16          70.    Removal pursuant to 28 U.S.C. § 1441(a) requires that "all defendants who have been

17  properly joined and served must join in or consent to the removal of the action."  28 U.S.C.

18  § 1446(b)(2)(A).  The Retailer Defendants are fraudulently joined and thus are not required to join

19  in the removal.  *See United Comp. Sys. Inc. v. AT&T Corp.*, 298 F.3d 756, 762 (9th Cir. 2002).

20  Nevertheless, while the Retailer Defendants do not independently contend that federal jurisdiction

21  is proper as to claims against them, they consent to this Notice on the basis that the claims against

22  them are without merit and that they are fraudulently joined in this action.  Notices of Consent to

23  Removal are attached as collective **Exhibit B**.

24          71.    The Removing Defendants are providing Plaintiffs with written notice of the filing of

25  this Notice of Removal as required by 28 U.S.C. § 1446(d).

26          72.    Pursuant to 28 U.S.C. § 1446(d), Removing Defendants are filing a copy of this Notice

27  of Removal with the Clerk of the Superior Court of the State of California in and for Alameda

28  County.

NOTICE OF REMOVAL

73.     Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings, orders and other papers filed in the state court action—as available from the state court docket or otherwise made available to the Removing Defendants at the time of filing this Notice—are attached as **Exhibit A**.

74.     If any question arises regarding the propriety of the removal of this action, the Removing Defendants respectfully request the opportunity to present a brief and be heard at oral argument in support of removal.

75.     No previous application has been made for the relief requested herein.

**V.    Demand for Jury Trial**

76.     The Removing Defendants hereby demand a separate jury trial on all claims and issues so triable.

WHEREFORE, the Removing Defendants give notice that the matter bearing Case No. RG20073321 pending in the Superior Court of the State of California in and for Alameda County is removed to the United States District Court for the Northern District of California.

Dated: October 6, 2020

By:    /s/ Jonathan Tam_____
Mark S. Cheffo (*pro hac vice* forthcoming)
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Email:  mark.cheffo@dechert.com

Will W. Sachse (pro hac vice forthcoming)
**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104
Telephone:  (215) 994-4000
Facsimile:   (215) 994-2222
Email: will.sachse@dechert.com

Jonathan Tam (SBN 304143)
**DECHERT LLP**
One Bush Street, Suite 1600
San Francisco, CA  94104-4446
Telephone: (415) 262-4500
Facsimile:  (415) 262-4555
Email: jonathan.tam@dechert.com

*Attorneys for Defendant GlaxoSmithKline LLC, incorrectly designated as DOE 3*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By:  */s/ Sharon D. Mayo* (as authorized on 10/6/2020)
Sharon D. Mayo (SBN 150469)
Tommy Huynh (SBN 306222)
**ARNOLD & PORTER KAYE SCHOLER LLP**
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:  415.471.3100
Facsimile:   415.471.3400
sharon.mayo@arnoldporter.com
tommy.huynh@arnoldporter.com

Kathryn M. Podsiadlo (SBN 299438)
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone:  213.243.4000
Facsimile:   213.243.4199
kathryn.podsiadlo@arnoldporter.com

*Attorneys for Sanofi US Services Inc., incorrectly
designated as DOE 5, and Sanofi-Aventis U.S.
LLC, incorrectly designated as DOE 6*

By:  */s/ Jessica B. Rydstrom* (as authorized on
10/6/2020)
Jessica B. Rydstrom (SBN 256600)
**WILLIAMS & CONNOLLY LLP**
725 12th Street NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile:  (202) 434-5029
jrydstrom@wc.com

*Attorney for Pfizer Inc., incorrectly designated as
DOE 4*

By:  */s/ Michael Shortnacy* (as authorized on
10/6/2020)
Andrew T. Bayman (*pro hac vice* forthcoming)
**KING & SPALDING LLP**
1180 Peachtree Street, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
abayman@kslaw.com

Michael B. Shortnacy (SBN 277035)
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310
mshortnacy@kslaw.com

NOTICE OF REMOVAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Defendant Boehringer Ingelheim Pharmaceuticals, Inc., incorrectly designated as DOE 1, and Boehringer Ingelheim USA Corporation incorrectly designated as DOE 2*

NOTICE OF REMOVAL