# Exhibit A

THE SUPERIOR COURT OF CALIFORNIA

# COUNTY OF ALAMEDA

Select Language ▼  | Español | Tiếng Việt | ਪੰਜਾਬੀ | 简体中文 | 繁體中文

Log In

## DomainWeb

*your resource for case filing information*

**Buy Credits**
**0 Credit(s)**    **Checkout (0 item(s))**

**DomainWeb**    **How This Site Works**    **FAQ**

## Case Details

**Case Number: RG20073321**          **Title: Bonvino VS Safeway, Inc.**

| Case Summary | Register of Action | Participants | Tentative Rulings |
| Future Hearings | Minutes |

| Date | Description | Pages | Price | | Select ☐ |
|------|-------------|-------|-------|--|--------|
| 9/22/2020 | Summons Issued and Filed | 3 | $3.00 | Half Page Preview | ☐ |
| 9/15/2020 | Notice of Assignment of Judge for All Purposes Issued | 4 | $4.00 | Half Page Preview | ☐ |
| 9/15/2020 | Initial Case Management Conference 02/18/2021 03:00 PM D- 15 | 2 | | View | |
| 9/8/2020 | Civil Case Cover Sheet Filed for Richard Bonvino | 2 | $2.00 | Half Page Preview | ☐ |
| 9/8/2020 | Complaint - Product Liability Filed | 57 | $31.00 | Half Page Preview | ☐ |

Page: 1 of 1

**Add Item(s) to buy**

Case Details - Domain Web

**Back to Search Results**

Feedback     Use and Privacy Policy     System Requirements     Contact Us     ® 2020 - Superior Court of California County of Alameda

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Jennifer A. Moore (SBN 206779)
Moore Law Group, PLLC
1473 South 4th Street
Louisville, KY 40208

TELEPHONE NO.: (502) 717-4080    FAX NO.: (502) 717-4086
ATTORNEY FOR *(Name):* Plaintiffs

**FILED**
**ALAMEDA COUNTY**

SEP 8 2020

CLERK OF THE SUPERIOR COURT

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Alameda
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland 94612
BRANCH NAME: Rene C. Davidson Courthouse

CASE NAME:
Richard Bonvino, et al. v. Safeway, Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: RG20073321 |
|---|---|---|
| ✔ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder |

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

JUDGE:
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
✔ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ✔ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ✔ monetary  b. ☐ nonmonetary; declaratory or injunctive relief  c. ✔ punitive
4. Number of causes of action *(specify):* 3 (Three)
5. This case ☐ is ✔ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 09/08/2020
Jennifer A. Moore
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

 

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*
**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or*
    *toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil*
    *harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer*
      *or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
      *domain, landlord/tenant, or*
      *foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex*
    *case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-*
      *domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified*
    *above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-*
      *harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified*
    *above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

22744059

**FILED**
ALAMEDA COUNTY

SEP 8 2020

CLERK OF THE SUPERIOR COURT
By _____
                                    Deputy

1  Jennifer A. Moore (SBN 206779)
   jennifer@moorelawgroup.com
2  **MOORE LAW GROUP, PLLC**
   1473 South 4th Street
3  Louisville, KY 40208
   Tel: (502) 717-4080 / Fax: (502) 717-4086
4

5  *Attorney for Plaintiffs*

6

7          **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**
                   **COUNTY OF ALAMEDA**
8

9  RICHARD BONVINO; RAYMOND JACK;          Case No.
   ROSA MATTHEWS; ALAM ALI;                          **RG20073321**
10 PLAINTIFIF MICHELE GIL, ON BEHALF
   OF JOSE GIL, JR., DECEDENT;            **COMPLAINT**
11 PLAINTIFF BRANDI SMITH ON BEHALF
   OF TAMARA REYNOLDS, DECEDENT;          **DEMAND FOR JURY TRIAL**
12 PLAINTIFF HAROLD BAKER ON
   BEHALF OF SHARON BAKER,
13 DECEDENT; GEORGE KELLY; JACK
   DUDUM; ANTHONY SCARSCIOTTI;
14 SENTELLE EUBANKS; ROBERT
   HASSON; RAYMOND ACOSTA; BARRY
15 WEINER; KURT CARR; JUNE YU; KIRK
   WILLIAMS; ERIC JOHNSON; LEWIS
16 WOODS; STEVEN NEWKIRK; DALE
17 BREMENOUR; DANIEL MATHENY;
   LORETHA BARTHEL; RICHARD
18 PELOQUIN; LINDA GOOLSBY;
   WALTER CARDINAL; MARYBELLE
19 CALHOUN; ROY TADA; DONALD
20 QUICK; ANTHONY NICHOGI; TOMMY
   DAVIS; PLAINTIFF LINDA KELLY ON
21 BEHALF OF DAVID KELLY,
   DECEDENT; GUY HARRIS; MICHAEL
22 JOHNSON; STANLEY KELLY; LINDA
   STIERS; GLORIA TRILLO-ROBINSON;
23 BRIAN LEE; RAYMOND HARTLEY;
24 CHRISTINA DIAZ; MICHELLE
   SANDOWSKY; LAURIE WOODS;
25 WILLIAM FAST; JUDITH MOTYKA;
26 KAREN FLEEMAN; CHRISTOPHER
   VILLA; GERALD MARINER; CLARENCE
27 DYKES; PLAINTIFF ROCKY JENSEN ON
28



---
                        1
                   COMPLAINT



1   BHEALF OF JULIA JENSEN,
    DECEDENT; SAMUEL PEWETT;
2   JULIETA MARX; PETER LOONEY;
    PLAINTIFF FAITH PERUE ON BEHALF
3   OF WILLIAM PERUE, DECEDENT;
    RAYMOND HARTLEY; ROY TADA;
4   DENNIS KARST; and DENNY
5   ELLINGSEN,

6                    Plaintiffs,

7        v.

8
    SAFEWAY, INC.; SAFEWAY HEALTH,
9   INC.; THE VONS COMPANIES, INC.;
    GROCERY OUTLET; KAISER
10  PERMANENTE INTERNATIONAL; and
    DOES 1 through 100 inclusive,
11
12                   Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

1

## <u>TABLE OF CONTENTS</u>

2
Page

3
TABLE OF CONTENTS..................................................................................................................3

4
INTRODUCTION ...........................................................................................................................5

5
PARTIES .........................................................................................................................................6

6
     I.      Plaintiffs............................................................................................................6

7
     II.     Defendants ......................................................................................................16

8
            A.     Doe Defendants..........................................................................17

9
JURISDICTION AND VENUE ....................................................................................................19

10
FACTUAL ALLEGATIONS .........................................................................................................20

11
     I.      Regulatory History of Ranitidine-Containing Products...................................20

12
     II.     Recalls and the FDA's Ban ..............................................................................22

13
     III.    Dangers of NDMA ...........................................................................................26

14
     IV.    How Ranitidine Transforms into NDMA Within the Human Body..............................31

15
            A.     Formation of NDMA in the Environment of the Human Stomach .................32

16
            B.     Formation of NDMA in the Other Organs of Human Body ...........................39

17
            C.     Formation of NDMA by Exposure to Heat and/or Time..................................41

18
            D.     Evidence Also Directly Links Ranitidine Exposure to Cancer........................43

19
     V.     Defendants Made False Statements in the Labeling of Their Ranitidine-Containing
20
            Products........................................................................................................45

21
     VI.    Defendants Knew or Should Have Known of the NDMA Risk ....................................45

22
     VII.   Exemplary / Punitive Damages Allegations ...................................................................49

23
     VIII.  Equitable Tolling/Estoppel .............................................................................................49

24
CAUSES OF ACTION ..................................................................................................................50

25
     COUNT I:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN .............................50

26
     COUNT II: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT ...............54

27
     COUNT III: NEGLIGENCE ....................................................................................................55

28
JURY TRIAL DEMAND ..............................................................................................................57

1

PRAYER FOR RELIEF ....................................................................................57

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

COMPLAINT

# INTRODUCTION

1.     This is a personal injury action for damages relating to Defendants' design, manufacture, sale, marketing, advertising, promotion, testing, labeling, packaging, handling, distribution, and storage of ranitidine-containing drugs including the brand name, Zantac, and its various generic forms ("Ranitidine-Containing Drugs," unless specifically identified).

2.     Plaintiffs bring this action for personal injuries suffered as a result of ingesting the defective and unreasonably dangerous Ranitidine-Containing Drugs and developing various cancers and their sequelae as a result of this ingestion.

3.     As more particularly set forth herein, Plaintiffs maintain that the Ranitidine-Containing Drugs they ingested are defective, dangerous to human health, unfit and unsuitable to be advertised, marketed, and sold in the United States, were manufactured improperly, and lacked proper warnings of the dangers associated with their use.

4.     N-Nitrosodimethylamine ("NDMA") is a potent carcinogen.  Discovered as a biproduct in manufacturing rocket fuel in the early 1900s, today, its only use is to induce tumors in animals as part of laboratory experiments.  Its only function is to cause cancer.  It has no business being in a human body.

5.     Zantac, the popular antacid medication that was used by millions of people every day, leads to the production of staggering amounts of NDMA when it is digested by the human body.  The U.S. Food and Drug Administration's ("FDA") allowable daily limit of NDMA is 96 ng (nanograms) and yet, in a single dose of Zantac, researchers are discovering over 3 million ng.

6.     These recent revelations by independent researchers have caused widespread recalls of Zantac and its generic forms both domestically and internationally, including the domestic recall by the current owner and controller of the Zantac new drug application ("NDA").  Recently, on April 1, 2020, the FDA banned all Ranitidine-Containing Drugs sold in the United States.

7.     The high levels of NDMA observed in Ranitidine-Containing Drugs is a function of the ranitidine molecule:  (1) the way it breaks down in the human digestive system; and (2) the way it breaks down when exposed to heat, in particular, during transport and storage.

8.     This lawsuit seeks to hold Defendants responsible for defective design, manufacturing,

COMPLAINT

1 | sale, handling, distribution, and storage that caused Plaintiffs' severe injuries.

2 | <center>**PARTIES**</center>

3 | **I.    Plaintiffs**

4 | 9.    Plaintiff Richard Bonvino consumed Ranitidine-Containing Drugs.  As a direct and
5 | proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed
6 | with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff
7 | with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

8 | 10.    Plaintiff Raymond Jack consumed Ranitidine-Containing Drugs.  As a direct and
9 | proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed
10 | with cancer.  Safeway, Inc., Safeway Health, Inc., and Grocery Outlet supplied Plaintiff with the
11 | Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

12 | 11.    Plaintiff Rosa Matthews consumed Ranitidine-Containing Drugs.  As a direct and
13 | proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed
14 | with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff
15 | with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

16 | 12.    Plaintiff Alam Ali consumed Ranitidine-Containing Drugs.  As a direct and proximate
17 | result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.
18 | Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff with the
19 | Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

20 | 13.    Plaintiff Michele Gil on behalf of Jose Gil, Jr, Decedent, consumed Ranitidine-
21 | Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-
22 | Containing Drugs, Decedent was diagnosed with cancer.  Kaiser Permanente International supplied
23 | Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

24 | 14.    Plaintiff Brandi Smith on behalf of Tamara Reynolds, Decedent, consumed
25 | Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic
26 | Ranitidine-Containing Drugs, Decedent was diagnosed with cancer.  Kaiser Permanente International
27 | supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

28 | 15.    Plaintiff Harold Baker on behalf of Sharon Baker, Decedent, consumed Ranitidine-

<center>6</center>
<center>COMPLAINT</center>

1   Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-

2   Containing Drugs, Decedent was diagnosed with cancer.  Kaiser Permanente International supplied

3   Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

4        16.    Plaintiff George Kelly consumed Ranitidine-Containing Drugs.  As a direct and

5   proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

6   with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

7   with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

8        17.    Plaintiff Jack Dudum consumed Ranitidine-Containing Drugs.  As a direct and

9   proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

10  with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

11  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

12       18.    Plaintiff Anthony Scarsciotti consumed Ranitidine-Containing Drugs.  As a direct and

13  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

14  with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

15  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

16       19.    Plaintiff Sentelle Eubanks consumed Ranitidine-Containing Drugs.  As a direct and

17  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

18  with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

19  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

20       20.    Plaintiff Robert Hasson consumed Ranitidine-Containing Drugs.  As a direct and

21  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

22  with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

23  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

24       21.    Plaintiff Raymond Acosta consumed Ranitidine-Containing Drugs.  As a direct and

25  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

26  with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

27  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

28       22.    Plaintiff Barry Weiner consumed Ranitidine-Containing Drugs.  As a direct and

COMPLAINT

1    proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

2    with cancer.  The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs,

3    which caused Plaintiff's injuries.

4        23.    Plaintiff Kurt Carr consumed Ranitidine-Containing Drugs.  As a direct and proximate

5    result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.

6    The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused

7    Plaintiff's injuries.

8        24.    Plaintiff June Yu consumed Ranitidine-Containing Drugs.  As a direct and proximate

9    result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.

10   The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused

11   Plaintiff's injuries.

12       25.    Plaintiff Kirk Williams consumed Ranitidine-Containing Drugs.  As a direct and

13   proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

14   with cancer.  The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs,

15   which caused Plaintiff's injuries.

16       26.    Plaintiff Eric Johnson consumed Ranitidine-Containing Drugs.  As a direct and

17   proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

18   with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

19   with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

20       27.    Plaintiff Lewis Woods consumed Ranitidine-Containing Drugs.  As a direct and

21   proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

22   with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

23   with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

24       28.    Plaintiff Steven Newkirk consumed Ranitidine-Containing Drugs.  As a direct and

25   proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

26   with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

27   with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

28       29.    Plaintiff Dale Bremenour consumed Ranitidine-Containing Drugs.  As a direct and

1  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

2  with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs,

3  which caused Plaintiff's injuries.

4      30.    Plaintiff Daniel Matheny consumed Ranitidine-Containing Drugs. As a direct and

5  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

6  with cancer. Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

7  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

8      31.    Plaintiff Loretha Barthel consumed Ranitidine-Containing Drugs. As a direct and

9  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

10  with cancer. Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

11  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

12      32.    Plaintiff Richard Peloquin consumed Ranitidine-Containing Drugs. As a direct and

13  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

14  with cancer. Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

15  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

16      33.    Plaintiff Linda Goolsby consumed Ranitidine-Containing Drugs. As a direct and

17  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

18  with cancer. Safeway, Inc. and Safeway Health, Inc. supplied Plaintiff with the Ranitidine-

19  Containing Drugs, which caused Plaintiff's injuries.

20      34.    Plaintiff Walter Cardinal consumed Ranitidine-Containing Drugs. As a direct and

21  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

22  with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs,

23  which caused Plaintiff's injuries.

24      35.    Plaintiff Marybelle Calhoun consumed Ranitidine-Containing Drugs. As a direct and

25  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

26  with cancer. Safeway, Inc. and Safeway Health, Inc. supplied Plaintiff with the Ranitidine-

27  Containing Drugs, which caused Plaintiff's injuries.

28      36.    Plaintiff Roy Tada consumed Ranitidine-Containing Drugs. As a direct and proximate

1  result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.
2  Safeway, Inc. and Safeway Health, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs,
3  which caused Plaintiff's injuries.

4      37.    Plaintiff Donald Quick consumed Ranitidine-Containing Drugs. As a direct and
5  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed
6  with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs,
7  which caused Plaintiff's injuries.

8      38.    Plaintiff Anthony Nichogi consumed Ranitidine-Containing Drugs. As a direct and
9  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed
10  with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs,
11  which caused Plaintiff's injuries.

12      39.    Plaintiff Tommy Davis consumed Ranitidine-Containing Drugs. As a direct and
13  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed
14  with cancer. Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff
15  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

16      40.    Plaintiff Linda Kelly on behalf of David Kelly, Decedent, consumed Ranitidine-
17  Containing Drugs. As a direct and proximate result of consuming carcinogenic Ranitidine-
18  Containing Drugs, Decedent was diagnosed with cancer. Safeway, Inc., Safeway Health, Inc., and
19  The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused
20  Plaintiff's injuries.

21      41.    Plaintiff Guy Harris consumed Ranitidine-Containing Drugs. As a direct and
22  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed
23  with cancer. Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff
24  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

25      42.    Plaintiff Michael Johnson consumed Ranitidine-Containing Drugs. As a direct and
26  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed
27  with cancer. Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff
28  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

43.     Plaintiff Stanley Kelly consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

44.     Plaintiff Linda Stiers consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.  The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

45.     Plaintiff Gloria Trillo-Robinson consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.  The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

46.     Plaintiff Brian Lee consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer. The Vons Companies, Inc.  supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

47.     Plaintiff Raymond Hartley consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.  Safeway, Inc. and Safeway Health, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

48.     Plaintiff Christina Diaz consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.  The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

49.     Plaintiff Michelle Sandowsky consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.  The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

50.   Plaintiff Laurie Woods consumed Ranitidine-Containing Drugs. As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

51.   Plaintiff William Fast consumed Ranitidine-Containing Drugs. As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

52.   Plaintiff Judith Motyka consumed Ranitidine-Containing Drugs. As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

53.   Plaintiff Karen Fleeman consumed Ranitidine-Containing Drugs. As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

54.   Plaintiff Christopher Villa consumed Ranitidine-Containing Drugs. As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

55.   Plaintiff Gerald Mariner consumed Ranitidine-Containing Drugs. As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

56.   Plaintiff Clarence Dykes consumed Ranitidine-Containing Drugs. As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer. The Vons Companies, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

COMPLAINT

1    57.    Plaintiff Rocky Jensen on behalf of Julia Jensen, Decedent, consumed Ranitidine-

2  Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-

3  Containing Drugs, Decedent was diagnosed with cancer.  The Vons Companies, Inc. supplied

4  Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

5    58.    Plaintiff Samuel Pewett consumed Ranitidine-Containing Drugs.  As a direct and

6  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

7  with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

8  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

9    59.    Plaintiff Julieta Marx consumed Ranitidine-Containing Drugs.  As a direct and

10  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

11  with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

12  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

13    60.    Plaintiff Peter Looney consumed Ranitidine-Containing Drugs.  As a direct and

14  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

15  with cancer.  Safeway, Inc., Safeway Health, Inc., and The Vons Companies, Inc. supplied Plaintiff

16  with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

17    61.    Plaintiff Faith Perue on behalf of William Perue, Decedent, consumed Ranitidine-

18  Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-

19  Containing Drugs, Decedent was diagnosed with cancer.  Safeway, Inc. and Safeway Health, Inc.

20  supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

21    62.    Plaintiff Raymond Hartley consumed Ranitidine-Containing Drugs.  As a direct and

22  proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed

23  with cancer.  Safeway, Inc. and Safeway Health, Inc. supplied Plaintiff with the Ranitidine-

24  Containing Drugs, which caused Plaintiff's injuries.

25    63.    Plaintiff Roy Tada consumed Ranitidine-Containing Drugs.  As a direct and proximate

26  result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.

27  Safeway, Inc. and Safeway Health, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs,

28  which caused Plaintiff's injuries.

64.     Plaintiff Dennis Karst consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.  Safeway, Inc. and Safeway Health, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

65.     Plaintiff Denny Ellingsen consumed Ranitidine-Containing Drugs.  As a direct and proximate result of consuming carcinogenic Ranitidine-Containing Drugs, Plaintiff was diagnosed with cancer.  Safeway, Inc. and Safeway Health, Inc. supplied Plaintiff with the Ranitidine-Containing Drugs, which caused Plaintiff's injuries.

66.     Had any Defendant warned Plaintiffs that Ranitidine-Containing Drugs could lead to exposure to NDMA or, in turn, cancer, Plaintiffs would not have taken Ranitidine-Containing Drugs.

67.     Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Plaintiffs' use of and/or exposure to Ranitidine-Containing Drugs supplied and distributed by Defendants herein, Plaintiffs suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to cancer, other permanent physical deficits, permanent bodily impairment and other sequelae.  Plaintiffs' injuries required hospitalizations, in-patient surgeries, medication treatments, and other therapies to address the adverse physical effects and damage caused by Plaintiffs' use of and/or exposure to Ranitidine-Containing Drugs.

68.     As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 100, inclusive, Plaintiffs used and/or were exposed to Ranitidine-Containing Drugs and were diagnosed with serious health injuries including cancer.

69.     As a result of using and/or being exposed to Defendants' Ranitidine-Containing Drugs, Plaintiffs have been permanently and severely injured, having suffered serious consequences from Ranitidine-Containing Drugs

70.     As a further direct and proximate result of defects in Ranitidine-Containing Drugs and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs suffered severe mental and physical pain and have and will sustain permanent injuries and emotional

14
COMPLAINT

distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

71.     As a further direct and proximate result of defects in Ranitidine-Containing Drugs and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs required extensive emergency medical treatment, health care, attention and services, thereby incurring medical, incidental, and service expenses pertaining to emergency medical treatments and procedures undertaken in efforts to maintain and/or save Plaintiffs' lives.

72.     Plaintiffs are individuals who suffered damages as a result of injuries resulting from Plaintiffs' use and/or exposure to Ranitidine-Containing Drugs and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs, resulting from Plaintiffs' use and/or exposure to Ranitidine-Containing Drugs.  Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and DOES 1 through 100, inclusive.

73.     The product warnings for Ranitidine-Containing Drugs in effect during the time period Plaintiffs used and/or were exposed to Ranitidine-Containing Drugs were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Ranitidine-Containing Drugs use and/or exposure.

74.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Plaintiffs and the general public about the increased risk of serious adverse events that are described herein.

75.     Had Plaintiffs been adequately warned of the potential life-threatening side effects of the Defendants and DOES 1 through 100, and each of them, inclusive, Ranitidine-Containing Drugs, Plaintiffs would not have purchased, used or been exposed to Ranitidine-Containing Drugs.

76.     By reason of the foregoing, Plaintiffs developed serious and dangerous side effects including cancer and other cancers, related sequelae, physical pain and suffering, mental anguish, and loss of enjoyment of life.  By reason of the foregoing, Plaintiffs suffered economic losses and special damages including, but not limited to, loss of earning and medical expenses.  Plaintiffs' general and special damages are in excess of the jurisdictional limits of the Court.

77.     Plaintiffs have reviewed their potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state law.  Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question.  Plaintiffs have chosen to only pursue claims based on state law and are not making any claims which raise federal questions.  Accordingly, Plaintiffs contend that California State jurisdiction and venue is proper.

## II.     Defendants

78.     Defendant **Safeway, Inc**. is a Delaware corporation with its headquarters and principal place of business located at 11555 Dublin Canyon Rd., Alameda County, Pleasanton, California 94588.  Safeway, Inc. is a wholly owned subsidiary of Albertsons Companies, Inc.  Safeway, Inc. is a citizen of California and Delaware and is not a citizen of any other state.  At all relevant times, Safeway, Inc. has conducted business and derived substantial revenue from its advertising, selling, and marketing of Ranitidine-Containing Drugs within Alameda County and the State of California.

79.     Defendant **Safeway Health, Inc**. is a Delaware corporation with its headquarters and principal place of business located at 11555 Dublin Canyon Rd., Alameda County, Pleasanton, California 94588.  Safeway Health, Inc. is a citizen of California and Delaware and is not a citizen of any other state.  At all relevant times, Safeway Health, Inc. has conducted business and derived substantial revenue from its labeling, distribution, and marketing of generic Ranitidine-Containing Drugs in Alameda County and the State of California.  Safeway Health, Inc. labeled, distributed, and marketed generic Ranitidine-Containing Drugs manufactured by Perrigo Company, plc and Dr. Reddy's Laboratories Ltd on behalf of Defendant Safeway, Inc. and labeled and marketed by Safeway Health, Inc. as "Safeway Care" products.

80.     Collectively, Defendants, Safeway Inc. and Safeway Health, Inc., are referred to as "Safeway."

81.     The **Vons Companies, Inc**. ("Vons") is a Michigan Corporation with its headquarters and principal place of business located at 11555 Dublin Canyon Rd., Alameda County, Pleasanton, California 94588.  Vons is a wholly owned subsidiary of Albertsons Companies, Inc.  Vons is a citizen of California and Delaware and is not a citizen of any other state.  At all relevant times, Vons

1   has conducted business and derived substantial revenue from its advertising, selling, and marketing of

2   Ranitidine-Containing Drugs within Alameda County and the State of California.

3       82.    Defendant **Grocery Outlet** is a California corporation with its headquarters and

4   principal place of business located at 5650 Hollis Street, Alameda County, Emeryville, California

5   94608.  At all relevant times, Grocery Outlet has conducted business and derived substantial revenue

6   from its advertising, selling, and marketing of Ranitidine-Containing Drugs within Alameda County

7   and the State of California.

8       83.    Defendant **Kaiser Permanente International** ("Kaiser") is a California corporation

9   with its headquarters and principal place of business located at One Kaiser Plaza, Alameda County,

10   Oakland, California 94612.  At all relevant times, Kaiser has conducted business and derived

11   substantial revenue from its selling of Ranitidine-Containing Drugs within Alameda County and the

12   State of California by operating a pharmacy that dispenses Ranitidine-Containing Drugs.

13   **A. Doe Defendants**

14       84.    The true names and/or capacities, whether individual, corporate, partnership,

15   associate, governmental, or otherwise, of Defendants DOES 1 through 100, inclusive, and each of

16   them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious

17   names.  Plaintiffs are informed and believe, and thereon allege, that each Defendant designated herein

18   as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and

19   that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below,

20   and the resulting injuries to Plaintiffs, and damages sustained by Plaintiffs.  Plaintiffs will amend this

21   Complaint to allege the true names and capacities of said DOE Defendants when that same is

22   ascertained.

23       85.    Plaintiffs are informed and believe, and thereon allege, that at all times herein

24   mentioned, each of the Defendants and each of the DOE Defendants was the agent, servant,

25   employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of

26   them, and at all said times, each Defendants and each DOE Defendant was acting in the full course,

27   scope and authority of said agency, service, employment and/or joint venture.

28

86.     Plaintiffs are informed and believe and allege that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging and advertising of Ranitidine-Containing Drugs.  Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts, omissions and tortious conduct of its successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parent, subsidiary, affiliate, partner, co-venturer, merged company, alter ego, agent, equitable trustee, fiduciary and/or its alternate entities in that Defendants and DOES 1 through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a virtual destruction of Plaintiffs' remedy against each such alternate entity, and that each such Defendants has the ability to assume the risk spreading role of each such alternate entity.

87.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, that Defendants and DOES 1 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in Alameda County and the State of California.

88.     Upon information and belief, at relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate

18

COMPLAINT

1   commerce and into the State of California, including in Alameda County, either directly or indirectly

2   through third parties or related entities, Ranitidine-Containing Drugs.

3       89.     At relevant times, Defendants and DOES 1 through 100, inclusive, and each of them,

4   conducted regular and sustained business and engaged in substantial commerce and business activity

5   in the State of California, which included but was not limited to selling, marketing and distributing

6   Ranitidine-Containing Drugs in Alameda County and the State of California.

7       90.     At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of

8   them, expected or should have expected that their acts would have consequences within the United

9   States of America including the State of California and including Alameda County, said Defendants

10  derived and derive substantial revenue therefrom.

11                          **JURISDICTION AND VENUE**

12      91.     This Court has jurisdiction over this action pursuant to the California Constitution

13  Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except

14  those given by statute to other trial courts." The Statutes under which this action is brought do not

15  specify any other basis for jurisdiction. Further, diversity jurisdiction pursuant to 28 U.S.C. § 1332

16  does not exist based upon the citizenship of Plaintiffs and Defendants.

17      92.     This Court has personal jurisdiction over each Defendant insofar as each Defendant is

18  authorized and licensed to conduct business in the State of California, a resident of the State of

19  California, maintains and carries on systematic and continuous contacts in the State of California,

20  regularly transacts business within the State of California, and regularly avails itself of the benefits of

21  the State of California.

22      93.     Additionally, Defendants caused tortious injury by acts and omissions in this judicial

23  jurisdiction and caused tortious injury in this jurisdiction by acts and omissions outside this

24  jurisdiction while regularly doing and soliciting business, engaging in a persistent course of conduct,

25  and deriving substantial revenue from goods used or consumed and services rendered in this

26  jurisdiction.

27      94.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section

28  395(a) in that the headquarters and principal place of business of Defendants Safeway, Inc., Safeway

1   Health, Inc., The Vons Companies, Inc., Grocery Outlet, and Kaiser Permanente International are in

2   Alameda County.

3       95.     Plaintiffs seek relief that is within the jurisdictional limits of the Court.

4                              **FACTUAL ALLEGATIONS**

5   **I.      Regulatory History of Ranitidine-Containing Products**

6       96.     Defendants sold and dispensed Ranitidine-Containing Drugs under the brand name

7   "Zantac" or its generic version by either prescription or over-the-counter ("OTC").  Defendants sold

8   Ranitidine-Containing Drugs in the following forms:  injection, syrup, and/or tablets and capsules.

9       97.     Zantac (ranitidine) was originally discovered and developed by scientist John

10  Bradshaw on behalf of GlaxoSmithKline ("GSK")[1] in 1976.

11      98.     The drug belongs to a class of medications called histamine $H_2$-receptor antagonists

12  (or $H_2$ blockers), which decrease the amount of acid produced by cells in the lining of the stomach.

13  Other drugs within this class include cimetidine (Tagamet), famotidine (Pepcid), and nizatidine

14  (Tazac).

15      99.     Cimetidine (Tagamet), discovered and developed by Smith, Kline and French,[2] was

16  the first $H_2$ blocker to be developed and is the prototypical histamine $H_2$ receptor antagonist from

17  which the later members of the class were developed.  Indeed, Zantac was specifically developed by

18  GSK in response to the success of cimetidine.

19      100.    Zantac was approved by the FDA, pursuant to the New Drug Application ("NDA")

20  process in 1983 (NDA 18-703) and, quickly, became one of GSK's most successful products, being

21  the first prescription drug in history to reach $1 billion in sales, which in the pharmaceutical industry

22  is referred to as a "Blockbuster."

23

24

25  ─────────────────

    [1] Dr. Bradshaw was working for Glaxo Inc. at the time.  Glaxo Inc. later merged with the Wellcome
26  Foundation in 1995 to become Glaxo Wellcome plc.  Then, in 2000, Glaxo Wellcome plc merged
    with Smithkline Beecham plc to form GlaxoSmithKline plc. For the purposes of this Complaint,
27  these entities will be referred to as "GSK."
    [2] Smith, Kline and French later merged with the Beecham Group in 1989 to form SmithKline
28  Beecham plc. And, as discussed above, SmithKline Beecham plc was merged into GSK in 2000.

101.    In 1993, GSK entered into a joint venture with Pfizer[3] to develop an OTC version of Zantac. That joint venture led to FDA approval of an OTC version of Zantac in 1995. Zantac OTC was approved through an NDA process (NDA 20-520).

102.    In 1997, GSK's patent on ranitidine expired, and generic Ranitidine-Containing Drugs entered the market. Despite generic entry, however, brand name prescription and OTC Zantac continued to be sold. Although sales of brand-name Zantac declined as a result of generic and alternative products, Ranitidine-Containing Drug sales remained strong over time. As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

103.    In 1998, the joint venture between GSK and Pfizer dissolved. As part of the separation, GSK retained the rights to sell all forms of Zantac internationally and prescription Zantac in the U.S., while Pfizer retained the rights to sell OTC Zantac domestically and retained ownership over the Zantac trademark. Under this agreement, GSK retained control and responsibility over the prescription Zantac NDA and Pfizer retained control and responsibility over the OTC Zantac NDA.

104.    In October 2000, Pfizer obtained full rights to OTC Zantac in the United States and Canada from GSK pursuant to a divestiture and transfer agreement. As part of this agreement, GSK divested all domestic Zantac OTC assets to Pfizer including all trademark rights and removed the restrictions on Pfizer's ability to seek product line extensions or the approval for higher doses of OTC Zantac. GSK retained the right to exclusive use of the Zantac name for any prescription ranitidine-containing product in the United States.

105.    In October 2003, Pfizer submitted NDA 21-698 for approval to market OTC Zantac 150 mg. The FDA approved NDA 21-698 OTC Zantac 150 mg on August 31, 2004.

106.    In 2006, Pfizer through a divestiture agreement, transferred all assets pertaining to its Zantac OTC line of products, including the rights to sell and market all formulations of OTC Zantac in the United States and Canada, as well as all intellectual property, research and development, and

---

[3] The joint venture was between Glaxo Wellcome plc and Warner–Lambert, Inc. Warner-Lambert was later acquired by Pfizer, Inc. in 2000. For the purposes of this Complaint, Warner-Lambert will be referred to as Pfizer.

1  customer and supply contracts to Boehringer Ingelheim Pharmaceuticals, Inc. As part of this deal,

2  Boehringer obtained control and responsibility over all of the Zantac OTC NDAs.

3       107.   In 2009, GSK ceased marketing prescription Zantac in the U.S. and abandoned the

4  Zantac prescription NDA. Although, according to GSK's recent annual report (2019), GSK claims to

5  have "discontinued making and selling prescription Zantac tablets in 2017 … in the U.S."[4]

6       108.   In 2016, Boehringer sold the rights of OTC Zantac to Sanofi US Services, Inc. As part

7  of this deal, Sanofi obtained control and responsibility over the OTC NDA and currently retains that

8  control and responsibility.

9       109.   To date, the FDA has approved numerous generic manufacturers for the sale of

10  prescription and OTC Ranitidine-Containing Drugs through an Abbreviated New Drug Application

11  ("ANDA") process.

12  **II.**    **Recalls and the FDA's Ban**

13       110.   On September 9, 2019, pharmacy and testing laboratory Valisure LLC and

14  ValisureRX LLC (collectively, "Valisure") filed a Citizen Petition calling for the recall of all

15  ranitidine-containing products due to exceedingly high levels of NDMA found in ranitidine pills.

16  FDA and European regulators started reviewing the safety of ranitidine with specific focus on the

17  presence of NDMA.[5] This triggered a cascade of recalls by the makers and retailers of Ranitidine-

18  Containing Drugs.

19       111.   On September 13, 2019, the FDA's Director for Drug Evaluation and Research, Dr.

20  Janet Woodcock, issued a statement that some ranitidine medicines may contain NDMA.

21

22

23

24

25

26  [4] GlaxoSmithKline, plc, *Annual Report* at 37 (2019), *available at*
https://www.gsk.com/media/5894/annual-report.pdf

27  [5] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-

28  ndma-zantac-ranitidine; https://www.ema.europa.eu/en/news/ema-review-ranitidine-medicines-
following-detection-ndma.

112.    On September 24, 2019, generic manufacturer Sandoz Inc. voluntarily recalled all of its ranitidine-containing products due to concerns of a "nitrosamine impurity, N-nitrosodimethylamine (NDMA), which was found in the recalled medicine."[6]

113.    On September 26, 2019, Walgreens, Walmart, and Rite-Aid and Apotex Corp.—makers of generic OTC ranitidine—voluntarily recalled all ranitidine-containing products and removed the products from the shelves.[7]  Apotex issued a statement, noting that "Apotex has learned from the U.S. Food and Drug Administration and other Global regulators that some ranitidine medicines including brand and generic formulations of ranitidine regardless of the manufacturer, contain a nitrosamine impurity called N-nitrosodimethylamine (NDMA)[.]"[8]

114.    On September 28, 2019, CVS Health Corp. stated that it would stop selling Zantac and its own generic ranitidine-containing products out of concern that it might contain a carcinogen.

115.    On October 2, 2019, the FDA ordered testing on Zantac and specified a protocol to be used that did not involve the use of heat.[9]

116.    On October 8, 2019, GSK voluntarily recalled all Zantac and ranitidine-containing products internationally.[10]  As part of the recall, GSK publicly acknowledged that unacceptable levels of NDMA were discovered in Zantac and noted that "GSK is continuing with investigations into the potential source of the NDMA."[11]

---

[6] https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-sandoz-ranitidine-capsules-following-detection-impurity.
[7] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.
[8] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/apotex-corp-issues-voluntary-nationwide-recall-ranitidine-tablets-75mg-and-150mg-all-pack-sizes-and.
[9] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine
[10] https://www.gov.uk/government/news/zantac-mhra-drug-alert-issued-as-glaxosmithkline-recalls-all-unexpired-stock
[11] Justin George Varghese, *GSK recalls popular heartburn drug Zantac globally after cancer scare*, Reuters (Oct. 8, 2019), available at https://www.reuters.com/article/us-gsk-heartburn-zantac/gsk-recalls-popular-heartburn-drug-zantac-globally-after-cancer-scare-idUSKBN1WN1SL.

117.    On October 23, 2019, Dr. Reddy's Laboratories Ltd and Sanofi voluntarily recalled all of their ranitidine-containing products.[12]

118.    On October 28, 2019, Perrigo Company plc, Novitium Pharma LLC, and Lannet Company Inc., voluntarily recalled all their ranitidine-containing products from the market.[13]

119.    On November 1, 2019, the FDA announced the results of recent testing, finding "unacceptable levels" of NDMA in ranitidine-containing products, and requested that drug makers begin to voluntarily recall their ranitidine-containing products.[14]

120.    Between November 1, 2019 and February 27, 2020, the following ranitidine makers recalled their products from the market, citing NDMA concerns:  Aurobindo Pharma USA, Amneal Pharmaceuticals, LLC, American Health Packaging, Golden State Medical Supply, Precision Dose Inc., Glenmark Pharmaceutical Inc., Appco Pharma LLC, and Northwind Pharmaceuticals.[15]

121.    On January 2, 2020, research laboratory, Emery Pharma, submitted a Citizen Petition to the FDA, showing that NDMA accumulates in ranitidine at unsafe rates when exposed to heat levels that would occur during transport and storage.

122.    Emery's Citizen Petition outlined its substantial concern that Ranitidine is a time- and temperature-sensitive pharmaceutical product that develops a known carcinogen, NDMA, when exposed to heat, a common occurrence during shipping, handling, and storage.  In addition to warning about this condition, Emery requested agency directives to manufacturers and distributors to ship Ranitidine-Containing Products in temperature-controlled vehicles.

123.    In response,[16] on April 1, 2020, the FDA recounted that a recall is an "effective methods [sic.] of removing or correcting defective FDA-regulated products . . . particularly when

---

[12] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.
[13] *Id.*
[14] https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-tests-ranitidine.
[15] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.
[16] Letter of Janet Woodcock, Docket No. FDA-2020-P-0042 (April 1, 2020), *available at* https://emerypharma.com/wp-content/uploads/2020/04/FDA-2020-P-0042-CP-Response-4-1-2020.pdf.

those products present a danger to health."[17]  The FDA sought the voluntary consent of manufacturers to accept the recall "to protect the public health from products that present a risk of injury."[18]  The FDA found that the recall of all Ranitidine-Containing Products and public warning of the recall was necessary because the "product being recalled presents a serious health risk."[19]  The FDA therefore sent Information Requests to all applicants and pending applicants of Ranitidine-Containing Products "requesting a market withdrawal."[20]

124.    The FDA found its stability testing raised concerns that NDMA levels in some ranitidine products stored at room temperature can increase with time to unacceptable levels.  Other testing conducted by FDA revealed a correlation between NDMA levels and expiration date.  The FDA's testing eroded the agency's confidence that any ranitidine product could remain stable through its labeled expiration date.  Consequently, the FDA was compelled to order the products off the market.  The FDA's decision to ban the drug rendered moot Emery's request for temperature-controlled sales conditions.

125.    The FDA therefore issued a public statement requesting the immediate removal of all Ranitidine-Containing Products from the market due to the risk to public health.[21]  "The agency has determined that the impurity in some ranitidine products increases over time and when stored at higher than room temperatures and may result in consumer exposure to unacceptable levels of this impurity."  Based upon its own testing and evaluation, the FDA concluded that "NDMA levels increase in ranitidine even under normal storage conditions and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers."

---

[17] *Id., citing* 21 CFR 7.40(a).
[18] *Id.*
[19] *Id.*
[20] *Id.,* fn. 43.
[21] Press Release, *FDA Requests Removal of All Ranitidine Products (Zantac) from the Market*, U.S. Food and Drug Administration (April 1, 2020), *available at* https://www.fda.gov/news-events/press-announcements/fda-requests-removal-all-ranitidine-products-zantac-market

1    126.    The FDA's reaction to the NDMA crisis involving ranitidine has come under attack.

2    Over 43 different countries and jurisdictions took action to restrict or ban ranitidine-containing

3    products before the FDA took any action.[22]  Indeed, despite being notified of the problem by Valisure

4    in June 2019, the FDA left the drug on the market for nearly an entire year, during which time

5    countless more individuals were exposed to a carcinogen against their will.

6    127.    In late July 2020, Sanofi's and GSK's respective SEC filings disclosed that the U.S.

7    Department of Justice ("DOJ") has launched an investigation into the association between ingestion

8    of Ranitidine-Containing Drugs and cancer.[23]  Specifically, the DOJ is investigating whether GSK

9    and Sanofi SA failed to disclose information to the federal government regarding the presence of

10   NDMA in their Ranitidine-Containing Drugs.

11   **III.    Dangers of NDMA**

12   128.    According to the U.S. Environmental Protection Agency ("EPA"), "NDMA is a

13   semivolatile chemical that forms in both industrial and natural processes."[24]  It is one of the simplest

14   members of a class of N-nitrosamines, a family of potent carcinogens. The dangers that NDMA

15   poses to human health have long been recognized. A news article published in 1979 noted that

16   "NDMA has caused cancer in nearly every laboratory animal tested so far."[25] NDMA is no longer

17

18

19   [22] Margaret Newkirk and Susan Berfield, *FDA recalls are always voluntary and sometimes haphazard—and the agency doesn't want more authority to protect consumers*, Bloomberg

20   Businessweek (Dec. 3, 2019), *available at* https://www.bloomberg.com/graphics/2019-voluntary-drug-recalls-zantac/.

21   [23] Nate Raymond, *Sanofi, GSK face U.S. investigation over potential Zantac carcinogen link* (July 30, 2020), available at: https://www.reuters.com/article/health-zantac/sanofi-gsk-face-u-s-investigation-

22   over-potential-zantac-carcinogen-link-idUSL2N2F12IY

23   [24] United States Environmental Protection Agency, Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA) (Nov. 2017), https://www.epa.gov/sites/production/files/2017-

24   10/documents/ndma_fact_sheet_update_9-15-17_508.pdf (last visited Apr. 15, 2020).

     [25] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, The Globe and Mail (CANADA)

25   (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*,

     The Globe and Mail (CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian

26   Reserve "have been advised not to drink, cook or wash in the water because testing has found high

     levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to

27   cancer"); Kyrtopoulos et al, *DNA adducts in humans after exposure to methylating agents*, 405 Mut.

28   Res. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise

26

COMPLAINT

produced or commercially used in the United States, except for research, such as a tumor initiator in animal bioassays.   In other words, the only use for NDMA today is to cause cancer in laboratory animals.

129.    Both the EPA and the International Agency for Research on Cancer ("IARC") have classified NDMA as a probable human carcinogen.[26]

130.    The American Conference of Governmental Industrial Hygienists classifies NDMA as a confirmed animal carcinogen.[27]

131.    The U.S. Department of Health and Human Services ("DHHS") states that NDMA is reasonably anticipated to be a human carcinogen.[28] This classification is based upon DHHS's findings that NDMA caused tumors in numerous species of experimental animals, at several different tissue sites, and by several routes of exposure, with tumors occurring primarily in the liver, respiratory tract, kidney, and blood vessels.[29]

132.    The FDA considers NDMA a chemical that "could cause cancer" in humans.[30]

133.    The World Health Organization ("WHO") states that there is "conclusive evidence that NDMA is a potent carcinogen" and that there is "clear evidence of carcinogenicity."[31]

134.    As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

_____

predominantly to liver tumors, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").
[26] *See* EPA Technical Fact Sheet, *supra*; International Agency for Research on Cancer (IARC) - Summaries & Evaluations, N-NITROSODIMETHYLAMINE (1978), http://www.inchem.org/documents/iarc/vol17/n-nitrosodimethylamine.html (last visited Apr. 15, 2020).
[27] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.
[28] *Id.* at 3.
[29] https://www.epa.gov/sites/production/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.
[30] https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine
[31] World Health Organization, *Guidelines for Drinking Water Quality, N-Nitrosodimethylamine (NDMA)* (3rd ed. 2008), *available at* https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf.

27
COMPLAINT

135.    Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—Valsartan, Losartan, and Irbesartan—because the medications contained nitrosamine impurities that do not meet the FDA's safety standards.

136.    The no-observed-adverse-effect level ("NOAEL") is the level of exposure at which there is no biologically or significant increase in the frequency or severity of any adverse effects of the chemical. Due to NDMA's ability to affect DNA at a microscopic level, there is no NOAEL for NDMA. This means any amount of NDMA exposure increases risk.

137.    That said, the FDA has set an acceptable daily intake ("ADI") level for NDMA at 96 nanograms. This means, according to the FDA, consumption of 96 nanograms of NDMA a day would increase the risk of developing cancer by 0.001% over the course of a lifetime. That risk increases as the level of NDMA exposure increases. However, any level above 96 nanograms is considered unacceptable.[32] For example, tobacco smoke also contains NDMA. One filtered cigarette contains between 5 to 43 nanograms of NDMA.

138.    In mouse studies examining the carcinogenicity of NDMA through oral administration, animals exposed to NDMA developed cancer in the kidney, bladder, liver, and lung. In comparable rat studies, similar cancers were observed in the liver, kidney, pancreas, and lung. In comparable hamster studies, similar cancers were observed in the liver, pancreas, and stomach. In comparable Guinea-pig studies, similar cancers were observed in the liver and lung. In comparable rabbit studies, similar cancers were observed in the liver and lung.

139.    In other long-term animal studies in mice and rats utilizing different routes of exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

140.    Prior to the agency's ban on Ranitidine-Containing Drugs, the FDA considered the drug as category B for birth defects, meaning it was considered safe to take during pregnancy.

---

[32] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

However, in animal experiments, for those animals exposed to NDMA during pregnancy, the offspring had elevated rates of cancer in the liver and kidneys.

141.    NDMA is, itself, a very small molecule.  This allows it to freely pass through all areas of the body, including the blood-brain and placental barrier.  This is particularly concerning as ranitidine has been marketed for pregnant women and young children for years.

142.    In addition, NDMA breaks down into various derivative molecules that, themselves, are associated with causing cancer.  In animal studies, derivatives of NDMA induced cancer in the stomach and intestine (including colon).

143.    Research shows that lower levels of NDMA, *i.e.*, 40 ng, are fully metabolized in the liver, but high doses enter the body's general circulation.

144.    Numerous *in vitro* studies confirm that NDMA is a mutagen—causing mutations in human and animal cells.

145.    Overall, the animal data demonstrates that NDMA is carcinogenic in all animal species tested:  mice, rats, Syrian golden, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, fish, newts, and frogs.

146.    Pursuant to the EPA cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."[33]

147.    In addition to the overwhelming animal data linking NDMA to cancer, there are numerous human epidemiological studies exploring the effects of dietary exposure to various cancers. And, while these studies (several discussed below) consistently show increased risks of various cancers, the exposure levels considered in these studies are a very small fraction—as little as 1 millionth—the exposures noted in a single Zantac capsule, *i.e.*, 0.191 ng/day (dietary) v. 304,500 ng/day (Zantac).

---

[33] *See* https://www3.epa.gov/airtoxics/cancer_guidelines_final_3-25-05.pdf.

148.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in persons exposed to more than 0.51 ng/day.[34]

149.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons exposed to more than 0.191 ng/day.[35]

150.    In another 1995 epidemiological case-control study looking at, in part, the effects of dietary consumption on cancer, researchers observed a statistically significant elevated risk of developing aerodigestive cancer after being exposed to NDMA at .179 ng/day.[36]

151.    In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189 cases and a follow up of 24 years, researchers noted that "*N*-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[37]

152.    In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, pharynx, prostate, and brain cancer.[38]

153.    In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was

---

[34] Pobel, *et al.*, *Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in Marseille, France*, 11 EUROP. J. EPIDEMIOL. 67–73 (1995).

[35] La Vecchia, *et al.*, *Nitrosamine intake and gastric cancer risk*, 4 EUROP. J. CANCER. PREV. 469–474 (1995).

[36] Rogers, *et al.*, *Consumption of nitrate, nitrite, and nitrosodimethylamine and the risk of upper aerodigestive tract cancer*, 5 CANCER EPIDEMIOL. BIOMARKERS PREV. 29–36 (1995).

[37] Knekt, *et al.*, *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-nitroso Compounds: A Follow-Up Study*, 80 INT. J. CANCER 852–856 (1999)

[38] Straif, *et al.*, *Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers*, 57 OCCUP ENVIRON MED 180–187 (2000).

30
COMPLAINT

1    significantly associated with increased cancer risk in men and women" for all cancers, and that

2    "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[39]

3        154.    In a 2014 epidemiological case-control study looking at NDMA dietary exposure with

4    2,481 cases, researchers found a statistically significant elevated association between NDMA

5    exposure and colorectal cancer.[40]

6        155.    In addition to studies demonstrating that NDMA directly causes cancer, research

7    shows that exposure to NDMA (1) can exacerbate existing but dormant cancers (*i.e.*, not malignant),

8    (2) promote otherwise "initiated cancer cells" to develop into cancerous tumors; and (3) reduce the

9    ability of the body to combat cancer.  Thus, in addition to NDMA being a direct cause of cancer

10    itself, NDMA can also be a contributing factor to a cancer injury caused by some other source.

11        156.    NDMA is also known to be genotoxic—meaning, it can cause DNA damage in human

12    cells.  Indeed, multiple studies demonstrate that NDMA is genotoxic both *in vivo* and *in vitro*.

13    However, recent studies have shown that the ability of NDMA to cause mutations in cells is affected

14    by the presence of enzymes typically found in living humans, suggesting that "humans may be

15    especially sensitive to the carcinogenicity of NDMA."[41]

16    **IV.    How Ranitidine Transforms into NDMA Within the Human Body**

17        157.    The NDMA contained in ranitidine-containing products is not caused by any direct

18    contamination.  Rather, the ranitidine molecule, itself, contains the constituent molecules to form

19    NDMA.  *See* Figure 1.

20

21

22

23

24

---

25    [39] Loh, *et al.*, *N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 AM J CLIN NUTR. 1053–61 (2011).

26    [40] Zhu, *et al.*, *Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada*, 111 BR J NUTR. 6, 1109–1117 (2014).

27    [41] World Health Organization, *Guidelines for Drinking Water Quality, N-Nitrosodimethylamine (NDMA)* (3rd ed. 2008), *available at* https://www.who.int/water_sanitation_health/dwq/chemicals/ndmasummary_2ndadd.pdf.

28

158.    Specifically, the O=N (Nitroso) on one side of the ranitidine molecule can combine with the H₃C-N-CH₃ (DMA) on the other side to form NDMA.  The NDMA forms out of the ranitidine molecule itself.

**Figure 1 – Diagram of Ranitidine & NDMA Molecules**



159.    The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the American water supply.[42]  Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater treatment plants was specifically linked to the presence of ranitidine.[43]

160.    Ranitidine leads to NDMA exposure by: (1) formation of NDMA in the human stomach; (2) formation of NDMA due to an enzymatic reaction throughout the human body; and (3) formation of NDMA due to heat and time.

**A.  Formation of NDMA in the Environment of the Human Stomach**

161.    When the ranitidine molecule is exposed to the acidic environment of the stomach, particularly when accompanied by nitrites (a chemical commonly found in heartburn-inducing

---

[42] Ogawa, *et al.*, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 J. Bio. Chem. 17, 10205-10209 (1989).
[43] Mitch, *et al.*, *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 Env. Eng. Sci. 5, 389-404 (2003).

COMPLAINT

1  foods), the Nitroso molecule (0=N) and the DMA molecule ($H_3C\text{-}N\text{-}CH_3$) break off and reform as

2  NDMA.

3      162.    In 1981, Dr. Silvio de Flora, an Italian researcher from the University of Genoa,

4  published the results of experiments he conducted on ranitidine in the well-known journal, The

5  Lancet.  When ranitidine was exposed to human gastric fluid in combination with nitrites, his

6  experiment showed "toxic and mutagenic effects[.]"[44]  Dr. de Flora hypothesized that these

7  mutagenic effects could have been caused by the "formation of more than one nitroso derivative

8  [which includes NDMA] under our experimental conditions." *Id.*  Dr. de Flora cautioned that, in the

9  context of ranitidine ingestion, "it would seem prudent to ... suggest[] a diet low in nitrates and

10  nitrites, by asking patients not to take these at times close to (or with) meals[.]"[45]  *Id.*

11      163.    GSK knew of Dr. de Flora's publication because, two weeks later, GSK responded in

12  The Lancet, claiming that the levels of nitrite needed to induce the production of nitroso derivatives

13  (*i.e.*, NDMA) were not likely to be experienced by people in the real world.[46]

14

15

16

17

18

19

20

21

22

23

24  [44] De Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, THE LANCET 993-994 (Oct. 31, 1981).
25  [45] This admonition came two years before the FDA's approved Zantac in 1983.  Notwithstanding, in
26  1998 GSK applied for and obtained an indication for OTC Zantac "[f]or the prevention of meal-induced heartburn at a dose of 75 mg taken 30 to 60 minutes prior to a meal." *See*
27  https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/ 20520s1_Zantac.pdf. So, GSK specifically invited patients to take Zantac shortly before eating heartburn-inducing food.
28  [46] R. T., Brittain, et al, *Safety of Ranitidine*, THE LANCET (Nov. 14, 1981).

COMPLAINT

164.    In its submission to the FDA, GSK explained that the level of nitrite present would be unrealistic and, thus, these results had no "practical clinical significance:"[47]

> Although N-nitroso-nitrolic acid was a potent mutagen, it is not likely to be formed in the stomach of a patient ingesting ranitidine, as an unrealistically large amount of nitrite needs to be present to form and maintain the nitrosamine. For this reason, and also because ranitidine was not carcinogenic in life-span studies in rodents, the in vitro nitrosation of ranitidine to a mutagenic nitrosamine does not seem to have practical clinical significance.

165.    Around this same time—before Zantac was approved by the FDA—GSK conducted another study to examine, among other things, how long-term use of ranitidine could affect the levels of nitrite in the human stomach.[48]  Remarkably, in the study that was presented to the FDA, GSK admitted that ranitidine use caused the proliferation of bacteria in the human stomach that are known to convert nitrates to nitrites, which leads to elevated levels of nitrite in the stomach environment. GSK acknowledged this could increase the risk of developing NDMA and, in turn, cancer, but then dismissed this risk because people were only expected to use ranitidine-containing products for a short-term period:

> The importance of this finding is not clear.  High levels of nitrite could react with certain organic compounds to form nitrosamines, which are known carcinogens.  To date, however, neither ranitidine nor cimetidine have been carcinogenic in rodents, so the level of human risk cannot be estimated from animal studies.  Ranitidine is recommended only for short-term use and carcinogenic risk, if any, should thus be minimized.

---

[47] Excerpted from the Summary Basis of Approval submitted to the FDA to obtain approval of Zantac in the early 1980s.  This document was obtained through a Freedom of Information Act request to the FDA.
[48] The results of this study are discussed in the Summary Basis of Approval, obtained from the FDA.

166.    GSK knew—and indeed specifically admitted—that ranitidine could react with nitrite in the human stomach to form NDMA and, at the same time, that long-term use of ranitidine could lead to elevated levels of nitrite in the human stomach.

167.    In response to Dr. de Flora's findings, in 1982, GSK conducted a clinical study specifically investigating gastric contents in human patients.[49] The study, in part, specifically measured the levels of N-Nitroso compounds in human gastric fluid. GSK indicated that there were no elevated levels, and even published the results of this study five years later, in 1987. The study, however, was rigged. It did not use gold-standard mass spectrometry to test for NDMA, but instead, used a process that could not measure N-nitrosamines efficiently. And worse, in the testing it did do, GSK refused to test gastric samples that contained ranitidine in them out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded." *Id.* So, GSK did not test for NDMA in any gastric fluid that contained ranitidine.

168.    In 1983, the same year Zantac obtained approval from the FDA, seven researchers from the University of Genoa published a study discussing ranitidine and its genotoxic effects (ability to harm DNA).[50] The researchers concluded "it appears that reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitroso-derivative (or derivatives) [like NDMA] capable of inducing DNA damage in mammalian cells." *Id.*

169.    Then, again in 1983, Dr. de Flora, along with four other researchers, published their complete findings.[51] The results "confirm our preliminary findings on the formation of genotoxic derivatives from nitrite and ranitidine[.]" *Id.* Again, the authors noted that, "the widespread clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest the prudent adoption of some simple measures, such as a diet low in nitrates and nitrites or the prescription of these anti-ulcer drugs at a suitable interval from meals." *Id.* This admonition carries weight

---

[49] Thomas, *et al.*, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 6 GUT. Vol. 28, 726-738 (1987).

[50] Maura, *et al.*, *DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 TOX. LTTRS. 97-102 (1983).

[51] De Flora, *et al.*, *Genotoxicity of nitrosated ranitidine*, 4 CARCINOGENESIS 3, 255-260 (1983).

considering GSK's studies indicate that long-term ranitidine consumption, itself, leads to elevated levels of nitrites in the human gut.

170.    The high instability of the ranitidine molecule was elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed.[52] These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment plants which supply many American cities with water.

171.    In 2016, researchers at Stanford University conducted an experiment on healthy volunteers (Stanford Study).[53] They measured the NDMA in urine of healthy individuals over the course of 24 hours, administered one dose of ranitidine, and then measured the NDMA in the urine of the same individuals for another 24 hours.  On average, the level of NDMA increased by 400 times, to approximately 47,000 nanograms.  The only change during that 24-hour period was the consumption of ranitidine.  This study directly demonstrated that unsafe levels of NDMA are formed in the human body as a result of ranitidine ingestion.  The scientists further explained that humans do not typically excrete NDMA in their urine, so that the observed 47,000 nanograms likely only captured 1/100 of the actual NDMA levels in the human body.

172.    These studies did not appreciate the full extent of NDMA formation risk from ranitidine; specifically, the added danger of this drug having not only a labile DMA group but also a readily available nitroso source in its nitrite group on the opposite terminus of the molecule.  Recent testing reveals that NDMA levels in ranitidine batches are so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself.

173.    Valisure is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO") – an accreditation recognizing the laboratories technical competence for regulatory.  Valisure's mission is to help

---

[52] Le Roux, *et al.*, *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 Environ. Sci. Technol. 20, 11095-11103 (2012).
[53] Zeng, *et al.*, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37 CARCINOGENESIS 625-634 (2016).

ensure the safety, quality, and consistency of medications and supplements in the market.  In

response to rising concerns about counterfeit medications, generics, and overseas manufacturing,

Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays

to test every batch of every medication it dispenses.

174.    In its September 9, 2019 Citizen's Petition to the FDA, Valisure disclosed as part of

its testing of Zantac, and other ranitidine-containing products that in every lot tested there were

exceedingly high levels of NDMA discovered. Valisure's ISO 17025 accredited laboratory used FDA

recommended GC/MS headspace analysis method FY19-005-DPA8 for the determination of NDMA

levels.  As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[54]

The results of Valisure's testing show levels of NDMA well above 2 million ng per 150 mg Zantac

tablet, shown below in Table 1.

| Table 1 – Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| 150 mg Tablets or equivalent | Lot # | NDMA per tablet (ng) |
| Reference Powder* | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mint), CVS | 9AE2864 | 3,267,968 |
| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

---

[54] US Food and Drug Administration. (updated 01/25/2019). Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, *FY19-005-DPA-S.*

175.     Valisure's testing shows, on average, 2,692,291 ng of NDMA in a 150 mg Zantac tablet.  Considering the FDA's permissible limit is 96 ng, this would put the level of NDMA at *28,000 times* the legal limit.  In terms of smoking, a person would need to smoke at least 6,200 cigarettes to achieve the same levels of NDMA found in one 150 mg dose of Zantac.

176.     Valisure, however, was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130 °C in the FDA recommended GC/MS protocol.  So, Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

177.     Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach.  Industry standard "Simulated Gastric Fluid" ("SGF" 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF" 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.  The inclusion of nitrite in gastric fluid testing is commonplace and helps simulate the environment of a human stomach.

178.     Indeed, Zantac was specifically advertised to be used when consuming foods containing high levels of nitrates, like tacos, pizza, *etc*.[55]

179.     The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2).

| Table 2 – Valisure Biologically Relevant Tests for NDMA Formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet without Solvent | Not Detected | Not Detected |

---

[55] *See, e.g.*, https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; https://youtu.be/jzS2kuB5_wg; https://youtu.be/Z3QMwkSUlEg; https://youtu.be/qvh9gyWqQns.

| Tablet | Not Detected | Not Detected |
|---|---|---|
| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
| Simulated Intestinal Fluid | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

180.    Under biologically relevant conditions, when nitrites are present, high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the FDA-allowable limit.  In terms of smoking, one would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg Zantac at the 25 nanogram level (over 7,000 for the 50 nanogram level).

181.    When the scientific data is assessed overall, the literature demonstrates that the ingestion of ranitidine in the presence of human-relevant levels of nitrite in the stomach—a substance that is commonly found in foods that induce heartburn and that is known to be elevated in people taking ranitidine for longer than a month—the ranitidine molecule breaks down into levels of NDMA that would dramatically increase a person's risk of developing cancer.

**B. Formation of NDMA in the Other Organs of Human Body**

182.    In addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH"), which can occur in other tissues and organs separate from the stomach.

183.    Liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder.  The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the

COMPLAINT

endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[56]

184.    In Figure 2, below, computational modelling demonstrates that ranitidine (shown in green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey) in a manner similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine ("ADMA," shown in blue).



Figure 2 – Computational Modelling of Ranitidine Binding to DDAH-1 Enzyme

A)    DDAH-1 Enzyme
ADMA
Ranitidine

B)    Predicted Affinity (kcal/mol)

| | Predicted Affinity (kcal/mol) |
|---|---|
| ADMA | -5.9 ± 0.2 |
| Ranitidine | -6.1 ± 0.1 |

185.    These results indicate that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

186.    Figure 3 below, derived from the National Center for Biotechnology Information, illustrates the expression of the DDAH-1 gene in various tissues in the human body.

[56] Ogawa, *et al.*, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 *J. BIO. CHEM.* 17, 10205-10209 (1989).

COMPLAINT



187.    DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the liver, prostate, stomach, bladder, brain, colon, and prostate. This offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs, including the bladder.

188.    The possible enzymatic reaction of ranitidine to DDAH-1, or other enzymes, suggests that high levels of NDMA can form throughout the human body. Indeed, ranitidine metabolizes and circulates throughout the human body, crossing the placental and blood-brain barrier, within 1-2 hours. When the ranitidine interacts with the DDAH-1 enzyme in various organs throughout the body, it breaks down into NDMA. This observation is validated by the Stanford study.

**C. Formation of NDMA by Exposure to Heat and/or Time**

189.    The risk of creating NDMA by exposing ranitidine to heat has been well-known and documented, going back at least as far as the early 1980's. Early studies, including the one conducted by GSK in the early 1980s, demonstrated that NDMA formed when ranitidine was exposed to heat. This point was underscored in the Valisure petition, which specifically developed a detection protocol that did not use heat.

COMPLAINT

190.    In response to Valisure, on October 2, 2019, the FDA recommended that researchers use the LC-HRMS protocol for detecting NDMA in ranitidine because the "testing method does not use elevated temperatures" and has been proven capable of detecting NDMA.

191.    On January 2, 2020, Emery Pharma, an FDA-certified pharmaceutical testing laboratory, conducted a series of tests on ranitidine using the FDA-recommended LC-HRMS protocol. The researchers exposed ranitidine to 70 ˚C for varying periods of time. The results showed that increasing levels of NDMA formed based on exposure to heat. The following diagram reveals how NDMA accumulates over time when exposed to 70 ˚C:



Figure 4 – Rate of Development of NDMA when Exposed to Heat

192.    The researchers cautioned:

NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures, which would be routinely reached during shipment and during storage. More importantly, these conditions occur post-lot release by the manufacturer. Hence, while NDMA levels in ranitidine may be acceptable at the source, they may not be so when the drug is purchased and subsequently at the time of consumption by the consumer.

193.    Indeed, the FDA's recent testing confirms that NDMA levels increase in ranitidine even under normal storage conditions, and NDMA has been found to increase significantly in

COMPLAINT

1  samples stored at higher temperatures, including temperatures to which ranitidine may be exposed

2  during distribution and handling by consumers.[57]

3      194.    The results of this data – in conjunction with the historical data from the 1980s –

4  demonstrate that in normal transport and storage, and especially when exposed to heat, the ranitidine

5  molecule systematically breaks down into NDMA, accumulating over time in the finished product.

6  Considering ranitidine-containing products have an approved shelf life of 36 months, the possibility

7  of the drug accumulating dangerously high levels of NDMA prior to consumption is very real—a

8  point underscored by the FDA's swift removal of the product from the market.

9      **D.  Evidence Also Directly Links Ranitidine Exposure to Cancer**

10     195.    In addition to numerous epidemiology studies examining how NDMA causes cancer

11 in humans, researchers have also specifically looked at ranitidine and found an association with

12 cancer.

13     196.    One epidemiology study, published in 2004, showed that men taking either ranitidine

14 or cimetidine (Tagamet) had increased risks of bladder cancer.[58]

15     197.    In one epidemiology study specifically designed to look at breast cancer, ranitidine

16 was shown to more than double the risk of breast cancer, an effect that was even more pronounced in

17 those with specific gene mutations.[59]

18     198.    In another comprehensive epidemiological study looking at various cancer risks and

19 H2 blockers, including ranitidine, the data showed that ranitidine consumption increased the risk of

20 prostate, lung, esophageal, pancreatic, and kidney cancer.  Of particular note, the study indicated that

21 people under the age of 60 that took ranitidine were five times more likely to contract prostate cancer.

22

23

24

25 [57] Press Release, *FDA Requests Removal of All Ranitidine Products (Zantac) from the Market*, U.S.
Food and Drug Administration (April 1, 2020), *available at* https://www.fda.gov/news-events/press-
26 announcements/fda-requests-removal-all-ranitidine-products-zantac-market

27 [58] D. Michaud, et al, *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of
Male Health Professionals*, 13 CANCER EPI. BIOMARK. & PREV. 250–254, 252 (Feb. 2004).

28 [59] Robert W. Mathes, et al, *Relationship between histamine2-receptor antagonist medications and
risk of invasive breast cancer*, 17 CANCER EPI. BIOMARKERS & PREVENTION 1, 67-72 (2008).

199.    A study published in 2018, demonstrated an increased risk of liver cancer associated with use of ranitidine in comparison with other histamine type 2 receptor antagonists (H2RAs) in the class.  The purpose of the study was to determine whether there was an increased risk of liver cancer associated with proton pump inhibitors, a different class of medications indicated for the treatment of GERD.  This finding is particularly notable as the authors adjusted for variables and, more significantly, did not study or consider long term use of H2RAs or the possibility of a dose dependent increase in risk.[60]

200.    In 2018, a study found an increased risk in hepatocellular carcinoma associated with use of H2RAs.[61] The authors were evaluating the risk of cancer in association with proton pump inhibitors and looked at H2RAs as a confounder. The study only considered use of H2RAs within one year of cancer diagnosis and still found an increased odds ratio associated with use of H2RAs and hepatocellular carcinoma, a type of liver cancer.

201.    A number of other studies have been published over the years showing an increased risk of various cancers associated with use of ranitidine and/or H2RAs.[62]  However it is especially noteworthy that Memorial Sloan Kettering, in conjunction with various researchers, plan to publish a study specifically looking at ranitidine users and cancer risks in the Journal of the American Medical Association ("JAMA"). The article was accepted and is set for publication.

---

[60] Kim Tu Tran,, et al., *Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two population-based studies*, 48 ALIMENTARY PHARMA & THERAP 1, 55-64 (2018).
[61] Shao, Y-HJ, et al., *Association between proton pump inhibitors and the risk of hepatocellular carcinoma*, 48 ALIMENTARY PHARMA & THERAP 4, 460-468 (2018).
[62] Robert W. Mathes, et al., *Relationship between histamine2-receptor antagonist medications and risk of invasive breast cancer*, 17 CANCER EPID. & PREV BIOMARKERS 1, 67-72 (2008); *see also* Ahn, Jeong Soo, et al., *Acid suppressive drugs and gastric cancer: a meta-analysis of observational studies*, 19 WORLD J. GASTROENTEROLOGY 16, 2560 (2013); Lai, Shih-Wei, et al., *Use of proton pump inhibitors correlates with increased risk of pancreatic cancer: a case-control study in Taiwan*, 46 KUWAIT MED J. 1, 44-48 (2014); Poulsen et al., *Proton Pump Inhibitors and risk of gastric cancer – a population based cohort study*, 100 BRITISH J CANCER 1503-1507 (2009); E Wennerström, *Acid-suppressing therapies and subsite-specific risk of stomach cancer*, 116 BRITISH J CANCER 9, 1234-1238 (2017).

1

2

**V.     Defendants Made False Statements in the Labeling of Their Ranitidine-Containing Products**

3

4

5

202.    A manufacturer is required to give adequate directions for the use of a pharmaceutical drug such that a "layman can use a drug safely and for the purposes for which it is intended,"[63] and conform to requirements governing the appearance of the label.[64]

6

7

8

203.    "Labeling" encompasses all written, printed or graphic material accompanying the drug or device,[65] and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.

9

10

11

204.    "Most, if not all, labeling is advertising.  The term "labeling" is defined in the FDCA as including all printed matter accompanying any article.  Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising."[66]

12

13

205.    If a manufacturer labels a drug but omits ingredients, that renders the drug misbranded.[67]

14

15

206.    Because the Defendants did not disclose NDMA as an ingredient in the Ranitidine-Containing Products ingested by Plaintiffs, the subject drugs were misbranded.

16

17

207.    It is unlawful to introduce a misbranded drug into interstate commerce.[68]  Thus, the Ranitidine-Containing Products ingested by Plaintiff were unlawfully distributed and sold.

18

**VI.    Defendants Knew or Should Have Known of the NDMA Risk**

19

20

21

22

208.    During the time that Defendants sold Ranitidine-Containing Drugs in the United States, the weight of scientific evidence showed that Ranitidine-Containing Drugs exposed users to unsafe levels of NDMA.  Defendants failed to disclose this risk to consumers through any means and failed to report these risks to the FDA.

23

24

209.    Going back as far as 1981, two years before Zantac entered the market, research

25

26

27

28

[63] 21 C.F.R. § 201.5.
[64] 21 C.F.R. § 801.15.
[65] Id. 65 Fed. Reg. 14286 (March 16, 2000).
[66] *U.S. v. Research Labs.,* 126 F.2d 42, 45 (9th Cir. 1942).
[67] 21 C.F.R. § 201.6; 201.10.
[68] 21 U.S.C. § 331(a).

1    showed elevated rates of NDMA, when properly tested. This was known or should have been known

2    by the Defendants or any other maker or distributor of ranitidine-containing products.

3         210.    Defendants concealed the Zantac–NDMA link from consumers in part by not

4    reporting it to the FDA.

5         211.    Knowledge regarding the risk of NDMA in ranitidine was sufficiently available in the

6    publicly available scientific literature that any retailer of Ranitidine-Containing Drugs should have

7    known about the potential NDMA risks associated with ranitidine consumption.

8         212.    Defendants never conducted or provided the relevant studies to the FDA, nor did they

9    present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

10   Accordingly, because the Defendants never properly disclosed the risk to the FDA, they never

11   proposed any labeling or storage / transportation guidelines that would have addressed this risk.

12   Thus, the FDA was never able to reject any proposed warning or proposal for transport / storage.

13        213.    Nothing prevented any Defendant from, on its own, taking actions to prevent

14   accumulation of NDMA in ranitidine drugs by ensuring cooled storage and transport. Such actions

15   would not have required FDA approval, nor would they have violated any regulatory decisions or

16   laws.

17        214.    Defendants also knew federal law requires pharmaceutical drugs to be stored,

18   warehoused, and distributed in accordance with current "Good Manufacturing Practices" ("GMPs")

19   to ensure they meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. §

20   351(a)(2)(B).

21        215.    21 C.F.R. § 211.142(b) states that the GMPs required that warehousing of drug

22   products shall be performed to provide for "[s]torage of drug products under appropriate conditions

23   of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug

24   products are not affected." In other words, Defendants had a duty and were obligated to properly

25   store, handle, and warehouse Ranitidine-Containing Drugs.

26        216.    Testing conducted by the FDA, which led to the agency's ban on Ranitidine-

27   Containing Drugs, confirms that improper storage of Ranitidine-Containing Drugs has resulted in

28   extremely high levels of NDMA. FDA has also concluded that NDMA can increase in Ranitidine-

1  Containing Drugs even under normal storage conditions. and NDMA has been found to increase

2  significantly in samples stored at higher temperatures, including temperatures the product may be

3  exposed to during distribution and handling by consumers. FDA's testing also showed that as

4  Ranitidine-Containing Drugs age the level of NDMA in the product increases.

5      217.    FDA concluded that these defects raised the level of NDMA in Ranitidine-Containing

6  Drugs above the acceptable daily intake limit to the point that the drugs had to be banned.

7      218.    In a 1981 study published by GSK, the originator of the ranitidine molecule, the

8  metabolites of ranitidine in urine were studied using liquid chromatography.[69] Many metabolites

9  were listed, though there is no indication that NDMA was looked for.  Plaintiffs believe this was

10  intentional—a gambit by the manufacturer to avoid detecting a carcinogen in their product.  All

11  Defendants knew or should have known about this study and, therefore, were obligated to investigate

12  this issue properly.  None did.

13      219.    Indeed, in that same year, Dr. de Flora published a note in The Lancet discussing the

14  results of his experiments showing that ranitidine was turning into mutagenic N-nitroso compounds,

15  of which NDMA is one, in human gastric fluid when accompanied by nitrites – a substance

16  commonly found in food and in the body.  GSK was aware of this as GSK specifically responded to

17  the note and attempted to discredit it.  Defendants knew or should have known about this scientific

18  exchange as it was in a popular scientific journal, The Lancet.  Therefore, the Defendants were

19  obligated to investigate this issue properly, and none did.

20      220.    By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso

21  compounds (discussed previously), GSK published a clinical study specifically investigating gastric

22  contents in human patients and N-nitroso compounds.[70]  This study specifically indicated that there

23  were no elevated levels of N-nitroso compounds (of which NDMA is one).  However, the study was

24

25

26  [69] Carey, *et al.*, *Determination of ranitidine and its metabolites in human urine by reversed-phase ion-pair high-performance liquid chromatography*, 255 J. CHROMATOGRAPHY B: BIOMEDICAL SCI. & APPL.

27  1, 161-168 (1981).

28  [70] Thomas, *et al.*, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 6 *GUT*. Vol. 28, 726-738 (1987).

rigged to fail. It used an analytical system called a "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines. Furthermore, in addition to this approach being less accurate, GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded." So, without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed. Again, this spurious test was intentional and designed to mask any potential cancer risk. The inadequacy of this test was knowable in light of its scientific publication in 1987. All Defendants either knew or should have known about the inadequacy of this study and should have investigated the issue properly and/or took action to protect consumers from the NDMA risks in their products. None did.

221.    In fact, upon information and belief, none of the Defendants ever used a mass spectrometry assay to test for the presence of nitrosamines in any of the studies and trials they did in connection with their trials associated with the ranitidine NDA. That is because when using mass spectrometry, it requires heating of up to 130 degrees Celsius, which can result in excessive amounts of nitrosamines being formed. Had the Defendants used a mass spectrometry assay, it would have revealed in the finding of large amounts of NDMA, and the FDA would never have approved Zantac as being safe.

222.    Based on the public scientific information available starting in 1983 (or earlier), the Defendants knew or should have known that NDMA could form in ranitidine by exposure to heat and/or over time in storage. No Defendants, upon information and belief, took action to reduce this risk through altering supply-chain conduct or warning consumers. Additionally, no Defendants took any action to further investigate this issue notwithstanding the signal that existed in the scientific literature.

223.    There are multiple alternatives to Zantac that do not pose the same risk, such as Cimetidine (Tagamet), Famotidine (Pepcid), Omeprazole (Prilosec), Esomeprazole (Nexium), and Lansoprazole (Prevacid).

**VII.    Exemplary / Punitive Damages Allegations**

224.    Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.  Defendants were fully aware of the safety risks of Ranitidine-Containing Drugs, particularly the carcinogenic potential of Ranitidine-Containing Drugs as it transforms into NDMA within the chemical environment of the human body and/or during transport and/or storage.  Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers.

225.    This was not done by accident or through some justifiable negligence.  Rather, Defendants knew they could profit by convincing consumers that Ranitidine-Containing Drugs was harmless to humans, and that full disclosure of the true risks of Ranitidine-Containing Drugs would limit the amount of money Defendants would make selling the drugs. Defendants' object was accomplished not only through a misleading label, but through a comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading.  Plaintiffs were denied the right to make an informed decision about whether to purchase and use Ranitidine-Containing Drugs, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

226.    Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

**VIII.    Equitable Tolling/Estoppel**

227.    Plaintiffs assert all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule and/or fraudulent concealment.

228.    The discovery rule applies to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

229.    The nature of Plaintiffs' injuries, damages, or their causal relationship to Defendants' conduct was not discovered, and through reasonable care and due diligence could not have been

1    discovered until a date within the applicable statute of limitations for filing Plaintiffs' claims.

2        230.   The running of the statute of limitations is tolled due to equitable tolling.  Defendants

3    are estopped from relying on any statutes of limitation or repose by virtue of their acts of fraudulent

4    concealment, through affirmative misrepresentations and omissions to Plaintiffs and defects

5    associated with Ranitidine-Containing Drugs including the severity, duration, and frequency of risks

6    and complications.  Defendants affirmatively withheld and/or misrepresented facts concerning the

7    safety of Ranitidine-Containing Drugs.  As a result of Defendants' misrepresentations and

8    concealment, Plaintiffs could not have known or have learned through reasonable diligence that

9    Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and

10   proximate result of the wrongful acts and/or omissions of the Defendants.

11       231.   Given Defendants' affirmative actions of concealment by failing to disclose this

12   known but non-public information about the defects – information over which the Defendants had

13   exclusive control – and because Plaintiffs could not reasonably have known that Ranitidine-

14   Containing Drugs were and are defective, Defendants are estopped from relying on any statutes of

15   limitations or repose that might otherwise be applicable to the claims asserted herein.

16   <div align="center">**CAUSES OF ACTION**</div>

17   <div align="center">**COUNT I:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN**</div>

18   <div align="center">**(Against All Defendants)**</div>

19       232.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as

20   if fully stated herein.

21       233.   At all relevant times, Defendants engaged in the business of researching, testing,

22   developing, designing, manufacturing, labeling, marketing, selling, inspecting, handling, storing,

23   distributing, and promoting Ranitidine-Containing Drugs, which are defective and unreasonably

24   dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or

25   instructions concerning the dangerous characteristics of Ranitidine-Containing Drugs and NDMA.

26   These actions were under the ultimate control and supervision of Defendants.  At all relevant times,

27   Defendants registered, researched, manufactured, distributed, marketed, and sold Ranitidine-

28   Containing Drugs and aimed at a consumer market.

234.    Defendants researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, handled, stored, distributed, and promoted, and otherwise released into the stream of commerce their Ranitidine-Containing Drugs, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Ranitidine-Containing Drugs.

235.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, handle, store, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Ranitidine-Containing Drugs did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiffs of dangers associated with Ranitidine-Containing Drugs.  Defendants, as a manufacturer, seller, or distributor of pharmaceutical medication, are held to the knowledge of an expert in the field.

236.    Defendants had a continuing duty to provide appropriate and accurate instructions regarding the proper storage and handling of Ranitidine-Containing Drugs.

237.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Ranitidine-Containing Drugs because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

238.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' Ranitidine-Containing Drugs.

239.    Even though Defendants knew or should have known that Ranitidine-Containing Drugs posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the drugs. The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting Ranitidine-Containing Drugs, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as the

1   Plaintiffs.

2          240.    Defendants knew or should have known that their products created significant risks of

3   serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or

4   instruct consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to their products.

5   Defendants failed to warn and have wrongfully concealed information concerning the dangerous

6   level of NDMA in their Ranitidine-Containing Drugs and the potential for ingested Ranitidine-

7   Containing Drugs to transform into the carcinogenic NDMA compound, and further, have made false

8   and/or misleading statements concerning the safety of Ranitidine-Containing Drugs.

9          241.    At all relevant times, Defendants' Ranitidine-Containing Drugs reached the intended

10   consumers, handlers, and users or other persons coming into contact with these products, including

11   Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed,

12   labeled, and marketed by Defendants.

13         242.    Plaintiffs were exposed to Defendants' Ranitidine-Containing Drugs without

14   knowledge of their dangerous characteristics.

15         243.    At all relevant times, Plaintiffs used and/or were exposed to the use of Defendants'

16   Ranitidine-Containing Drugs while using them for their intended or reasonably foreseeable purposes,

17   without knowledge of their dangerous characteristics.

18         244.    Plaintiffs could not have reasonably discovered the defects and risks associated with

19   Ranitidine-Containing Drugs prior to or at the time of Plaintiffs consuming Zantac. Plaintiffs relied

20   upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious

21   health risks associated with using Defendants' products.

22         245.    Defendants knew or should have known that the minimal warnings disseminated with

23   their Ranitidine-Containing Drugs were inadequate, failed to communicate adequate information on

24   the dangers and safe use/exposure, and failed to communicate warnings and instructions that were

25   appropriate and adequate to render the products safe for their ordinary, intended and reasonably

26   foreseeable uses.

27         246.    The information that Defendants did provide or communicate failed to contain

28   relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to

avoid using the drug. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Ranitidine-Containing Drugs; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Ranitidine-Containing Drugs.

247.    This alleged failure to warn is not limited to the information contained on Ranitidine-Containing Drugs' labeling. The Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Ranitidine-Containing Drugs through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium.

248.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Ranitidine-Containing Drugs, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative medication. However, as a result of Defendants' concealment of the dangers posed by their Ranitidine-Containing Drugs, Plaintiffs could not have averted their injuries.

249.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Plaintiffs, with knowledge of the safety problems associated with Ranitidine-Containing Drugs, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

250.    The Defendants' lack of adequate warnings and instructions accompanying their Ranitidine-Containing Drugs were a substantial factor in causing Plaintiffs' injuries.

251.    As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of Ranitidine-Containing Drugs, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and

1   damages including, but not limited to past and future medical expenses, lost income, and other

2   damages.

3        252.    **WHEREFORE,** Plaintiffs respectfully request this Court to enter judgment in

4   Plaintiffs' favor for damages, together with interest, costs herein incurred, attorneys' fees and all such

5   other and further relief as this Court deems just and proper.

6        **COUNT II: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT**

7                              **(Against All Defendants)**

8        253.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as

9   if fully stated herein.

10       254.    At all times herein mentioned, Defendants designed, manufactured, tested, marketed,

11  sold, handled, distributed, and stored the Ranitidine-Containing Drugs ingested by Plaintiffs to

12  patients and physicians.

13       255.    At all relevant times, the medication ingested by Plaintiffs were expected to and did

14  reach Plaintiffs without a substantial change in its condition as manufactured, handled, distributed,

15  stored, and sold by Defendants.

16       256.    At all relevant times, the medications ingested by Plaintiffs were used in a manner that

17  was foreseeable and intended by Defendants.

18       257.    The Ranitidine-Containing Drugs ingested by Plaintiffs were not reasonably safe for

19  their intended use and were defective with respect to their manufacture, as described herein, in that

20  Defendants deviated materially from their design, manufacturing, handling, and storage specifications

21  and/or such design, manufacture, storage, and handling posed an unreasonable risk of harm to

22  Plaintiffs.

23       258.    The Defendants' Ranitidine-Containing Drugs are inherently dangerous and defective,

24  unfit and unsafe for its intended and reasonably foreseeable uses, and do not meet or perform to the

25  expectations of patients and their health care providers.

26       259.    The Ranitidine-Containing Drugs create risks to the health and safety of the patients

27  that are far more significant and devastating than the risks posed by other products and treatments

28  available to treat the corresponding medical conditions, and which far outweigh the utility of the

COMPLAINT

ranitidine-containing products because of Defendants' manufacturing defects, which included but were not limited to:

   a. Failure to follow Good Manufacturing Practices;

   b. Failure to adequately inspect/test the drugs during the manufacturing process;

   c. Failure to implement procedures that would reduce or eliminate NDMA levels in Ranitidine-Containing Drugs;

   d. Failure to implement appropriate handling instructions and storage conditions for the drug.

260.    Defendants have intentionally and recklessly manufactured the Ranitidine-Containing Drugs with wanton and willful disregard for the rights and health of the Plaintiffs, and with malice, placing their economic interests above the health and safety of the Plaintiffs.

261.    The manufacturing defects in Defendants' Ranitidine-Containing Drugs were substantial factors in causing Plaintiffs' injuries

262.    As a direct and proximate result of the Defendants' defective manufacture of the Ranitidine-Containing Drugs, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

**WHEREFORE**, Plaintiffs respectfully requests this Court to enter judgment in Plaintiffs' favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENCE

### (Against All Defendants)

263.    Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

264.    At all times relevant to this Complaint, Defendants had a duty to ensure that the Ranitidine-Containing Drugs supplied to Plaintiffs were stored, handled, and dispensed in a safe manner.

265.    In particular, Defendants had a duty to ensure that the Ranitidine-Containing Drugs

prescribed and/or sold to Plaintiffs were safely stored on Defendants' premises by conducting diligent surveillance, monitoring and inspection of storage and shelving practices.

266.   As described throughout this Complaint, storage of Ranitidine-Containing Drugs can lead to the formation of dangerous levels of NDMA within the drugs.  Extensive data exists to demonstrate that exposure to heat in storage conditions leads to the systematic breakdown of the ranitidine molecule into NDMA, accumulating over time in the finished product.  Considering Ranitidine-Containing drugs have an approved shelf life of 36 months, the possibility of the drug accumulating dangerously high levels of NDMA prior to consumption is very real—a point underscored by the FDA's swift removal of the product from the market.

267.   Defendants breached their duty to Plaintiffs by failing to properly store the Ranitidine-Containing Drugs supplied to Plaintiffs, leading to dangerous levels of NDMA accumulating in the drugs that harmed Plaintiffs.  Defendants acted below the standard of care by storing and dispensing Ranitidine-Containing Drugs to Plaintiffs without first undertaking efforts to ensure that the drugs were safe for human use by, for example, consulting the available medical literature evidencing the potential human health dangers associated with the storage of Ranitidine-Containing Drugs and the formation of NDMA within Ranitidine-Containing drugs when the drugs are stored and/or shelved at particular temperatures.

268.   Defendants knew or should have known that storage and/or shelving of Ranitidine-Containing Drugs can lead to the formation of dangerous levels of carcinogenic NDMA in the drugs.

269.   Defendants failed to adhere to and/or follow its established practices and procedures in storing and/or shelving the Ranitidine-Containing Drugs supplied to Plaintiffs.

270.   Specifically, each box of Zantac states: "avoid excessive heat" and cautions that the product be kept below 77°F.  Defendants could – and should – have taken steps to reduce NDMA accumulation by keeping the Ranitidine-Containing Drugs cool.

271.   As a direct and proximate result of Defendants' improper storage and/or shelving practices of the Ranitidine-Containing Drugs, Plaintiffs were exposed to dangerous levels of NDMA which caused Plaintiffs' cancer.

272.   As a direct and proximate result of Defendants' storage, handling and dispensing of

1    Ranitidine-Containing Drugs, Plaintiffs have been injured, sustained severe and permanent pain,

2    suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but

3    not limited to past and future medical expenses, and other damages.

4                             **JURY TRIAL DEMAND**

5        273.    Plaintiffs demand a trial by jury on all the triable issues within this pleading.

6                             **PRAYER FOR RELIEF**

7        274.    WHEREFORE, Plaintiffs request the Court to enter judgment in Plaintiffs' favor and

8    against the Defendants for:

9          a.   actual or compensatory damages in such amount to be determined at trial and as

10             provided by applicable law;

11          b.   exemplary and punitive damages sufficient to punish and deter the Defendants and

12             others from future wrongful practices;

13          c.   pre-judgment and post-judgment interest;

14          d.   costs including reasonable attorneys' fees, court costs, and other litigation expenses;

15             and

16          e.   any other relief the Court may deem just and proper.

17    Dated:  September 8, 2020        **MOORE LAW GROUP, PLLC**

18

19                                 Jennifer A. Moore (SBN 206779)

20                                 jennifer@moorelawgroup.com

21                                 **MOORE LAW GROUP, PLLC**

22                                 1473 South 4th Street

23                                 Louisville, KY 40208
                                Tel: (502) 717-4080 / Fax: (502) 717-4086

24

25                                 *Attorney for Plaintiffs*

26

27

28

COMPLAINT

Moore Law Group, PLLC
Attn: Moore, Jennifer A.
1473 South 4th Street
Louisville, KY   40208

---

## Superior Court of California, County of Alameda

| | |
|---|---|
| Bonvino <br> **Plaintiff/Petitioner(s)** <br> VS. <br><br> Safeway, Inc. <br> **Defendant/Respondent(s)** <br> (Abbreviated Title) | No. <u>RG20073321</u> <br><br> **NOTICE OF CASE MANAGEMENT CONFERENCE AND ORDER** <br> Unlimited Jurisdiction |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD**:

Notice is given that a Case Management Conference has been scheduled as follows:

| Date: **02/18/2021** <br> Time: **03:00 PM** | Department: **15** <br> Location: **Administration Building** <br> **Third Floor** <br> **1221 Oak Street, Oakland  CA  94612** <br><br> Internet: **www.alameda.courts.ca.gov** | Judge: **Evelio Grillo** <br> Clerk: **Pamela Drummer-Williams** <br> Clerk telephone: **(510) 267-6931** <br> E-mail: <br> **Dept.15@alameda.courts.ca.gov** <br> Fax: |

### ORDERS

1. **Plaintiff** must:

    a. **Serve** all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)); and

    b. **Give notice** of this conference to all other parties and file proof of service.

2. **Defendant must** respond as stated on the summons.

3. **All parties who have appeared before the date of the conference** must:

    a. **Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724;

    b. **File and serve** a completed *Case Management Statement* on Form CM-110  at least **15** days before the Case Management Conference (Cal. Rules of Court, rule 3.725); and

    c. **Post jury fees** as required by Code of Civil Procedure section 631.

4. If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30.  Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

5. You are further ordered to appear in person or through your attorney of record at the Case Management Conference noticed above. You must be thoroughly familiar with the case and fully authorized to proceed. You may be able to appear at Case Management Conferences by telephone.  Contact CourtCall, an independent vendor, at least three business days before the scheduled conference.  Call 1-888-882-6878, or fax a service request to (888) 882-2946.  The vendor charges for this service.

6. You may file *Case Management Conference Statements* by E-Delivery.  Submit them directly to the E-Delivery Fax Number (510) 267-5732.  No fee is charged for this service.  For further information, go to *www.alameda.courts.ca.gov/ff*.

7. The judge may place a *Tentative Case Management Order* in your case's on-line register of actions before the conference.  This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration.  Check the website of each assigned department for procedures regarding tentative case management orders at *www.alameda.courts.ca.gov/dc*.

---

**CLERK'S CERTIFICATE OF MAILING**

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served this Notice of Hearing by placing copies in envelopes addressed as shown hereon and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

       Executed on 09/16/2020.

By       _A. Qhen_
                  Digital
                                Deputy Clerk

## *Superior Court of California, County of Alameda*



## *Notice of Assignment of Judge for All Purposes*

Case Number: RG20073321
Case Title:     Bonvino VS Safeway, Inc.
Date of Filing: 09/08/2020

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

**Pursuant to Rule 3.734 of the California Rules of Court and Title 3 Chapter 2 of the Local Rules of the Superior Court of California, County of Alameda, this action is hereby assigned by the Presiding Judge for all purposes to:**

|   |   |
|---|---|
| **Judge:** | **Evelio Grillo** |
| **Department:** | **15** |
| **Address:** | **Administration Building** |
|  | **1221 Oak Street** |
|  | **Oakland  CA  94612** |
| **Phone Number:** | **(510) 267-6931** |
| **Fax Number:** |  |
| **Email Address:** | **Dept.15@alameda.courts.ca.gov** |

Under direct calendaring, this case is assigned to a single judge for all purposes including trial.

**Please note: In this case, any challenge pursuant to Code of Civil Procedure section 170.6 must be exercised within the time period provided by law.  (See Code Civ. Proc. §§ 170.6, subd. (a)(2) and 1013.)**

NOTICE OF NONAVAILABILITY OF COURT REPORTERS: Effective June 4, 2012, the court will not provide a court reporter for civil law and motion hearings, any other hearing or trial in civil departments, or any afternoon hearing in Department 201 (probate). Parties may arrange and pay for the attendance of a certified shorthand reporter. In limited jurisdiction cases, parties may request electronic recording.

Amended Local Rule 3.95 states: "Except as otherwise required by law, in general civil case and probate departments, the services of an official court reporter are not normally available. For civil trials, each party must serve and file a statement before the trial date indicating whether the party requests the presence of an official court reporter."

IT IS THE DUTY OF EACH PLAINTIFF AND CROSS COMPLAINANT TO SERVE A COPY OF THIS NOTICE IN ACCORDANCE WITH LOCAL RULES.

## General Procedures

Following assignment of a civil case to a specific department, all pleadings, papers, forms, documents and writings can be submitted for filing at either Civil Clerk's Office, located at the René C. Davidson Courthouse, Room 109, 1225 Fallon Street, Oakland, California, 94612, and the Hayward Hall of Justice, 24405 Amador Street, Hayward, California, 94544. All documents, with the exception of the original summons and the original civil complaint, shall have clearly typed on the face page of each document, under the case number, the following:

<div align="center">

ASSIGNED FOR ALL PURPOSES TO
JUDGE Evelio Grillo
DEPARTMENT 15

</div>

All parties are expected to know and comply with the Local Rules of this Court, which are available on the court's website at: http://www.alameda.courts.ca.gov/Pages.aspx/Local-Rules(1)  and with the California Rules of Court, which are available at www.courtinfo.ca.gov.

Parties must meet and confer to discuss the effective use of mediation or other alternative dispute processes (ADR) prior to the Initial Case Management Conference.  The court encourages parties to file a "Stipulation to Attend ADR and Delay Initial Case Management Conference for 90 Days".  Plaintiff received that form in the ADR information package at the time the complaint was filed.  The court's website also contains this form and other ADR information.  If the parties do not stipulate to attend ADR, the parties must be prepared to discuss referral to ADR at the Initial Case Management Conference.

Contacts with Dept. 15 should be by email to Dept. 15@alameda.courts.ca.gov. You must provide copies of all email communications to each party (or their attorneys, if represented) at the same time you send the email to the Court and you must show that you have done so in your email. When a copy of a document must be transmitted to court staff, an email attachment is preferable to fax. Use of an email attachment or fax, however, is not a substitute for filing of pleadings or other documents. Inclusion of available email addresses in the caption of all filed papers, as required by CRC 2.111(1) is required.

Parties/attorneys must confer before scheduling a hearing date. Counsel are expected to be familiar and comply with the Statement of Professionalism and Civility, Alameda County Bar Association www.acbanet.org.

Counsel should consider and recommend creative, efficient approaches to valuing and resolving their case (CRC §3.724).

## Schedule for Department 15

The following scheduling information is subject to change at any time, without notice. Please contact the department at the phone number or email address noted above if you have questions.

- Trials generally are held:  Unless otherwise advised, both court and jury trials are Mondays through Thursdays at 10:00 am through 4:30 pm; expect to be in the courtroom from 9:00 am to 5:00 pm. Cases may "trail" a trial in progress.

- Case Management Conferences are held:  Mon., Wed., Thurs. and Fri. at 9:15 am and Tues. at 3:00 pm. Timely filed and complete case management conference statements are required and may eliminate the need for a hearing.

- Law and Motion matters are heard:  Law & Motion hearings will be held on Tuesdays at 3:00 p.m. and Fridays at 10:00 a.m.  Email Dept. 15 for reservations. Include case name & number, title of motion and identity of moving party.  Courtesy copies shall be delivered to the department.

- Settlement Conferences are heard:  As scheduled by the Judge. Court resources are limited, and counsel should consider other ADR alternatives. Conferences will be specially set when deemed appropriate.

- Ex Parte matters are heard:  The applicant must contact the clerk for a hearing date and provide CRC 3.1203(a) notice to all parties.  The applicant must appear, in person or by phone if allowed, unless it is a stipulation for an order or otherwise allowed under CRC 3.1207.

## Law and Motion Procedures

To obtain a hearing date for a Law and Motion or ex parte matter, parties must contact the department as follows:

- Motion Reservations
  Email:        Dept.15@alameda.courts.ca.gov

  The parties should check the tentative rulings on the court's website and notify the courtroom clerk and all other parties of plans to contest by 4:00 pm the day before the hearing.

- Ex Parte Matters
  Email:        Dept15@alameda.courts.ca.gov

## Tentative Rulings

The court may issue tentative rulings in accordance with the Local Rules.  Tentative rulings will become the Court's order unless contested in accordance with the Local Rules. Tentative rulings will be available at:

- Website:  www.alameda.courts.ca.gov/domainweb, Calendar Information for Dept. 15

- Phone:  1-866-223-2244

Dated:  09/15/2020

_____  Facsimile
_____
Presiding Judge,
Superior Court of California, County of Alameda

## CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct:  I am the clerk of the above-named court and not a party to this cause.  I served this Notice by placing copies in envelopes addressed as shown on the attached Notice of Initial Case Management Conference and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.

Executed on 09/16/2020

By       _A. Qhei_
              Digital

              Deputy Clerk

22732548
SUM-100

# SUMMONS
## (CITACION JUDICIAL)

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br><br>SAFEWAY, INC.; SAFEWAY HEALTH, INC.; (See attached Attachment to Summons)<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br><br>RICHARD BONVINO; (See attached Attachment to Summons) | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)*<br><br>FILED<br>ALAMEDA COUNTY<br><br>SEP 2 2 2020<br><br>CLERK OF THE SUPERIOR COURT<br>By _____ Deputy |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

   *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es)*  Rene C. Davidson Courthouse<br>Superior Court of California, County of Alameda<br>1225 Fallon Street, Oakland, CA 94512 | **CASE NUMBER:**<br>*(Número del Caso):*<br>RG20073321 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jennifer A. Moore, Moore Law Group, PLLC, 1473 South 4th Street, Louisville, KY  40208; (502) 717-4080

| DATE:<br>*(Fecha)* | SEP 2 2 2020 | Chad Finke | Clerk, by<br>*(Secretario)* | _____ | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Richard Bonvino, et al. v. Safeway, Inc., et al. | RG20073321 |

**INSTRUCTIONS FOR USE**

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

[✔] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

RAYMOND JACK; ROSA MATTHEWS; ALAM ALI; PLAINTIFF MICHELE GIL, ON BEHALF OF
JOSE GIL, JR., DECEDENT; PLAINTIFF BRANDI SMITH ON BEHALF OF TAMARA REYNOLDS,
DECEDENT; PLAINTIFF HAROLD BAKER ON BEHALF OF SHARON BAKER, DECEDENT;
GEORGE KELLY; JACK DUDUM; ANTHONY SCARSCIOTTI; SENTELLE EUBANKS; ROBERT
HASSON; RAYMOND ACOSTA; BARRY WEINER; KURT CARR; JUNE YU; KIRK WILLIAMS;
ERIC JOHNSON; LEWIS WOODS; STEVEN NEWKIRK; DALE BREMENOUR; DANIEL MATHENY;
LORETHA BARTHEL; RICHARD PELOQUIN; LINDA GOOLSBY; WALTER CARDINAL;
MARYBELLE CALHOUN; ROY TADA; DONALD QUICK; ANTHONY NICHOGI; TOMMY DAVIS;
PLAINTIFF LINDA KELLY ON BEHALF OF DAVID KELLY, DECEDENT; GUY HARRIS; MICHAEL
JOHNSON; STANLEY KELLY; LINDA STIERS; GLORIA TRILLO-ROBINSON; BRIAN LEE;
RAYMOND HARTLEY; CHRISTINA DIAZ; MICHELLE SANDOWSKY; LAURIE WOODS;
WILLIAM FAST; JUDITH MOTYKA; KAREN FLEEMAN; CHRISTOPHER VILLA; GERALD
MARINER; CLARENCE DYKES; PLAINTIFF ROCKY JENSEN ON BEHALF OF JULIA JENSEN,
DECEDENT; SAMUEL PEWETT; JULIETA MARX; PETER LOONEY; PLAINTIFF FAITH PERUE ON
BEHALF OF WILLIAM PERUE, DECEDENT; RAYMOND HARTLEY; ROY TADA; DENNIS KARST;
and DENNY ELLINGSEN

Page __1__ of __2__

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Richard Bonvino, et al. v. Safeway, Inc., et al. | RG20073321 |

## INSTRUCTIONS FOR USE

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

THE VONS COMPANIES, INC.; GROCERY OUTLET; KAISER PERMANENTE INTERNATIONAL; and DOES 1 through 100 inclusive

Page ___2___ of ___2___

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**